CLEVELAND TRUST COMPANY, APPELLEE, *v.* SNYDER,
APPELLANT.

[Cite as Cleveland Trust Co. v. Snyder (1978),
55 Ohio App. 2d 168.]

(No. 36460—Decided January 30, 1978.)

Mr. *Alan H. Weinberg,* for appellee.
Mr. *R. Dugald Pearson,* for appellant.

PRYATEL, J. This case involves an action on the part of the appellee, The Cleveland Trust Company, BankAmericard Division (designated as CTCo), to collect from the appellant, Ruth G. Snyder, for unpaid cash advances made by the CTCo to her former husband, Robert H. Snyder, during the years 1971 and 1972 on his BankAmericard account.

On or about October 18, 1974, appellant Ruth G. Snyder was divorced from Robert H. Snyder. During the time of their marriage, on or about August 18, 1970, Robert H. Snyder applied for a Cleveland Trust BankAmericard. Mr. Snyder filled out and signed both an application for a Cleveland Trust BankAmericard, and the cardholder agreement, and was assigned BankAmericard Account No. 4447-180-598-095. At the same time, on the Cardholder Agreement, Mr. Robert H. Snyder authorized and requested the CTCo to make cash advances to his checking account, Account No. 0410-0068; 4060-1471. Cash advances were made by the CTCo to his checking account. His nonpayment of these cash advances is the subject of this litigation.

At a later unknown time and date, Robert H. Snyder picked up his wife and drove her to the CTCo (Shaker Square branch office), where she had her picture taken and where she signed one part of a two part form; the front side was entitled "Application for Cleveland Trust BankAmericard," and the rear side "Cardholder Agreement."

Unlike her husband, appellant did not apply for a Cleveland Trust BankAmericard. The application was blank in its entirety and contained no personal or financial information concerning the appellant and was neither signed nor dated.

The reverse side of the Application for The Cleveland Trust BankAmericard is entitled "Cardholder Agreement" and bears the signature of the appellant, Ruth G. Snyder, undated and with no checking account number shown.

The appellant and her husband also signed photograph request cards both of which bore the checking ac-

count number of Robert H. Snyder and the BankAmericard number assigned to Robert H. Snyder.

Sometime thereafter the appellant received a plastic card entitled BankAmericard which on its face contained a copy of her signature from the photograph request card form, underneath which appears the printed statement, AUTHORIZED SIGNATURE. Below this appears the account number assigned to Robert H. Snyder, No. 4447-180-598-095, and the following:

"Good Thru, 11/73 * BAC." At the bottom of the card is embossed the name of Robert H. Snyder.

On the reverse side of the plastic card appears a photograph of the appellant and a place for her signature, which she signed.

The BankAmericard allowed her to make purchases which were charged to the account assigned to her husband and upon which she was authorized to sign.

The appellant, Ruth G. Snyder, had no checking or savings account with CTCo then or ever. Nor was she authorized to sign on the checking account her husband maintained with the CTCo.

All cash advances by the CTCo were made to the checking account of Robert H. Snyder. No cash advances were ever made to the appellant. Nor did she at any time request any.

Statements regarding the account of Robert H. Snyder were sent to Robert H. Snyder at his Cleveland, Ohio, residence and then at a later date to his residence in Troy, Michigan.

All purchases by the appellant and Robert H. Snyder were paid for by Robert H. Snyder in the year made. However, Robert H. Snyder did not repay the CTCo for the cash advances made to his checking account. Thus, an action was filed in Cleveland Municipal Court, Case No. B-93634, and on August 12, 1975, a default judgment was entered by the court in favor of the CTCo against Robert H. Snyder for the full amount of $797.91 plus costs, which entry remains in effect and is not under appeal.

On September 11, 1975, a trial was held in the Cleve-

land Municipal Court in the same case wherein the appellant, Ruth G. Snyder, presented her evidence in opposition to the claim of appellee that (1) the appellant as cardholder was liable for payment of the cash advances made to her husband's checking account by the CTCo and (2) that the BankAmericard issued to Ruth G. Snyder was a joint account upon which both the defendant and her husband were jointly and severally liable.

The appellant used the BankAmericard issued to her to make four purchases, as evidenced by appellee's Exhibits A, B, C and D, received in evidence.

| Exhibit A, | 11/8/71 | D O Summers | $14.81 |
| Exhibit B, | 2/19/72 | Noble Photo | $26.18 |
| Exhibit C, | 4/1/72 | D O Summers | $ 3.03 |
| Exhibit D, | 6/29/? | Casual Center | $ 9.40 |

All of the above purchases were paid for by Mr. Snyder in the years made.

In accord with a Stipulation entered into, the total purchases, payments and advances as regards the account of Robert H. Snyder were as follows:

| Year | Purchases | Payments | Advances |
| --- | --- | --- | --- |
| 1971 | $1,430.64 | $1,474.18 | $ 600.00 |
| 1972 | $ 575.90 | $ 857.08 | 530.00 |
| 1973 | $ 196.46 | $ 555.00 | -0- |
| 1974 | $ -0- | $ 174.00 | -0- |

(Other amounts not shown to make up total amount of appellant's claim are finance and service charges.)

The appellee called two witnesses on its behalf, appellant, Ruth G. Snyder, for cross-examination and Mr. Robert J. Vale, an employee of CTCo, for direct examination. On cross-examination, Mr. Robert J. Vale admitted that he had been employed by the CTCo for only 2 years and had not commenced his employment until August of 1973, almost 3 years following Mr. Robert H. Snyder's receiving a BankAmericard from the CTCo. Mr. Vale testified that he was employed as a collector and that he had

never personally taken an Application for a BankAmericard while employed by the CTCo. He testified that he had not personally issued any request cards for the taking of photographs for use with CTCo of BankAmericards, and had not attended the signing of photo request cards by persons who were having their pictures taken. Nor was Mr. Vale in the employ of the CTCo when the appellant and her former husband had their pictures taken or when her husband signed for his application for a Cleveland Trust BankAmericard and Cardholder Agreement, or when the plastic BankAmericard was issued to the appellant for her use.

The appellant was the only witness to testify on her behalf. Her testimony was unrebutted.

Appellant contended that she was not a Cardholder because (1) she made no application for a BankAmericard, (2) signed no application for a BankAmericard, (3) no BankAmericard was issued to her as Cardholder, and that at the most she was issued a "Related Card."[1] Therefore, as a recipient of a "Related Card," she was neither jointly nor severally liable for her ex-husband's unpaid cash advances.

Appellant's further contention was that the only party liable by contract with the CTCo was her ex-husband, Robert H. Snyder, against whom the appellee obtained a judgment on August 12, 1975.

The appellant additionally maintained that the appellee was estopped, by its own actions in the issuing of the BankAmericard to her as it did, and the procedures followed by it thereafter, from claiming payment from the appellant, and that the appellant should have been dismissed. Both sides submitted briefs. Seven months after trial, on August 12, 1976, the court made the following Judgment Entry:

"Parties in court; trial had; Court finds and renders judgment for plaintiff against defendant Ruth Snyder for $835.91 and costs. ($76.00) Interest from 8/23/74.

. Judge"

_____ :

[1]See provision 1, Cardholder Agreement, *infra*.

From this Judgment Entry, the appellant filed her appeal, relying on eight assignments of error.

"1. The court refused or neglected to consider the blank and unsigned application for a Cleveland Trust Bank-Americard.

"2. The court refused or neglected to consider the terms and conditions as set forth in item 1 of the cardholder agreement.

"3. The court refused or neglected to consider the terms and conditions as set forth in item 9 of the cardholder agreement.

"4. The court erred in entering a judgment against the defendant-appellant as a related cardholder making the defendant a guarantor of her husband's account for cash advances received and used by him as a cardholder.

"5. The court erred in not concluding that the appellee, The Cleveland Trust Company, by its own actions was estopped from claiming that the defendant-appellant was a cardholder, when in its sole discretion and by its own action it had always treated and considered defendant-appellant as a related cardholder in accord with the terms and conditions of the cardholder agreement.

"6. The court erred in denying defendant-appellant's motion for a directed verdict at the conclusion of the appellee's case and again at the conclusion of the defendant-appellant's case.

"7. The conclusion reached by the court is unsupported by the evidence.

"8. The conclusion of the court is contrary to the weight of the evidence."

In substance, we believe that they can be distilled into two assignments which are the following:

I. That the conclusion reached by the court is contrary to the law and the evidence.

II. That the appellee is estopped from claiming that appellant was a cardholder.

The language of the "Cardholder Agreement" begins as follows:

"The undersigned (Cardholder) *hereby requests* the

Cleveland Trust Company (Bank) *upon approval of his application to establish a BankAmericard Account* (Account) and issue him a BankAmericard (Card) subject to the following terms and conditions hereby agreed to* * *."
(Emphasis added.)

We find the following undisputed evidence in the record on the direct examination of the appellant regarding her card:

"Q. Did you ask Cleveland Trust at any time to obtain a BankAmericard?

"A. No.

"Q. Did you ever agree with anybody at the Cleveland Trust Company that you would be responsible for any of your husband's charge obligations?

"A. No, I did not.

"Q. Did they ever ask you to be responsible?

"A. No, they did not."

Under cross-examination, in response to a question of the conditions under which she signed Joint Exhibit 2, appellant responded:

"I remember that my husband told me that we were going to get these cards, and he at that time—his office was at Shaker Square. He came to our house on Shelburne, picked me up and together we went to the Cleveland Trust Bank at the Shaker Square Office, and I remember getting the picture taken. This is literally as I remember about it."

It is undisputed and an examination of Joint Exhibit 2 confirms the fact that appellant neither filled out nor signed an application for a Card.* Thus, there was no request to establish a bank account based on an application that was executed and approved.

In the absence of these two requisites specifically spelled out in the contract, together with the bank's decision not to issue an account number separate from her

---

*We do not reach the propriety of the Bank's thrusting liability of holders of related-cards upon the cardholder, *after* obtaining the cardholder's signature on the application—since the appellant in our case, never signed an application.

husband, we hold that the appellant, Ruth Snyder, is not a cardholder as contemplated by the agreement, nor does the prefatory language "The undersigned (Cardholder)" in the introductory paragraph make her one.

What then is her status?

We believe that it is one of *recipient of a related card* —as identified throughout the agreement—a classification separate and distinct from that of a "cardholder." In reaching this conclusion, we point to the following language in the agreement.

Provision 1:

"Bank shall assign an Account number to the Cardholder established, in the Bank's sole discretion, *either* in the Cardholder's name *or* in the name of a member of the Cardholder's family, as determined by the Bank, currently having a Card issued by the Bank, provided however, that in the event the Account number is established in the name of the Cardholder the Bank is hereby authorized in its sole discretion to assign such Account number *to any member* of the Cardholder's family to whom a Card is issued by the Bank. All *such* Cards having the same Account number hereinafter collectively referred to as '*Related Cards.*'" (Emphasis added.)

Thus, the account may be established either in the name of the cardholder who has an account number or in the name of the recipient of a related card. It is the bank who makes the decision between one who already has a card and the account number and a member of the same family.[3] Thus, we have two separate identities—the cardholder and the holder of a related card.

That the bank considered these as separate classifications is supported throughout the agreement. Provision 3 points out that "any dispute between the member and the cardholder *and/or the holder of Related Cards* * * * shall be settled by and between them * * *."

---

[3]Once an applicant signs and files a request and application for an account which is approved, and a separate number is assigned and a card issued, only then does the recipient become a cardholder, as we see it.

In dealing with the subject of cash advances, the contract recites that "The Bank shall, * * * (b) issue to the Cardholder *and/or* holders of Related Cards, a plastic card for use in obtaining cash advances * * * and such advances shall be charged against the Account." (Provision 4.)

Indeed the range of responsibility, the persons it affects, and the one on whom responsibility rests, are clearly set forth in Provision 5, to-wit:

"The *Cardholder* shall be responsible for any and all credit extended on the account by virtue of (a) the purchases of goods and/or services through the use of the Card and/or Related Cards, and/or (b) services through the use of the Card and/or Related Cards and/or cash advances obtained through its use of the Card and/or Related Cards * * *."

That there are two separate aand different classifications—and so recognized by the Bank—is additionally seen in the burdens and privileges given to the Cardholder while denied the recipient of a related card.

In Provision 6, the *cardholder* in whose name the account is established shall be sent a single statement on the behalf of all holders of *related cards.* Such statement shall be deemed correct and conclusive as to the *cardholder* and all holders of *related cards,* unless otherwise notified in writing within 10 days after the statement is received by the *cardholder.* (The holder of a *related card* neither has the right to receive a statement nor to protest any errors.)

Refunds or adjustments in disputes are not made to holders of related cards—but reflected on the single statement of the cardholder. (See provision 3.) Thus, the return of the purchase by the holder of a Related Card is credited to the Cardholder's account.

In Provisions 7 and 8, dealing with payment, it is the cardholder who agrees to pay the account monthly (there is no mention of holders of *related cards*).

Upon the default of a cardholder and, or, the holder of a related card, the bank may call the outstanding in-

debtedness and its payment. falls upon the cardholder (provision 9).

Finally, the agreement can be amended upon 30 days' prior notice to the cardholder (provision 10). (The holder of a related card is not entitled to such notice.)

Is there a legal difference between the status of a cardholder and the holder of a related card? Is the holder of a related card responsible for the unpaid statement of a cardholder?

It is axiomatic that the intention of the parties governs in the interpretation of a contract. *Skivolocki* v. *East Ohio Gas Co.* (1974) 38 Ohio St. 2d 244.

Of course, we need not concern ourselves with the rules on construction if the language is clear. *Carroll Weir Funeral Home* v. *Miller* (1965), 2 Ohio St. 2d 189; *Aurora* v. *Bay Village* (1971), 27 Ohio App. 2d 17.

However, we are equally aware that where there is doubt in the meaning of a contract, it must be construed against the one who prepared the instrument. *Cleveland Concession Co.* v. *City of Cleveland* (1948), 84 Ohio App. 1.

Here, it is helpful to understand an agreement if we weigh it in light of the surrounding circumstances. *Stony's Trucking Co.* v. *Pub Util. Comm.* (1972) 32 Ohio St. 2d 139.

In interpreting this contract within its four corners, we are mindful of the surrounding circumstances. Robert H. Snyder, on August 18, 1970, requested and applied for a BankAmericard, and his application was approved and an account number issued according to the agreement.

Some time later he brought his wife there to set in motion the proceedings for her to receive a card, without her filling out and signing an application. The card was issued to her under his account and so reflected on the card given her. She used it and her purchases were charged to his account which he paid. He received advances which were charged to his account which he chose not to pay. Under the agreement, only he as a cardholder received the statement; only he could challenge its accuracy,

and only he need be notified of any change on the agreement.

That the cardholder is liable for the charges to his account, made by himself and by a holder of a related card, is clear. That a recipient of a related card is liable for the cash advances made to the cardholder is shrouded in doubt. Under the evidence, the language of the agreement and the law of contracts, we hold that the appellant, Ruth Snyder, is not a cardholder (as described in the contract) but rather the recipient of a related card. We conclude that appellant, Ruth Snyder, is not liable for the amount owing on her former husband's account for CTCo advances made to him.

Assignment of Error No. 1 is sustained.

Since we hold that the appellant is not a cardholder as contemplated in the agreement, the estoppel urged upon us in Assignment of Error No. 2 becomes moot and is therefore dismissed.

*Judgment reversed.*

KRENZLER, J., concurs.
PARRINO, J., dissents.