2002 SD 132

**Landers HARRIS, Plaintiff and Appellant,**

v.

**JEFFERSON PARTNERS, L.P. dba Jackrabbit Bus Lines, Defendant and Appellee.**

No. 22198.

Supreme Court of South Dakota.

Considered on Briefs Aug. 26, 2002.

Decided Oct. 23, 2002.

South Dakota, Attorneys for defendant and appellee.

KONENKAMP, Justice.

[¶ 1.] Injured in a traffic accident while riding a bus, a passenger sued the bus company and its driver for the tort of intentional infliction of emotional distress. The passenger alleged that following the accident, the bus company and its driver committed an extreme outrage in refusing to summon emergency medical care, in denying him transportation back to the bus station, and in failing to provide him a return ticket back to his home town. In his lawsuit, the passenger insisted that because this conduct was committed by a common carrier, the standards for proving intentional infliction of emotional distress were relaxed. Concluding that this conduct did not meet the stringent requirements for this tort, the circuit court granted the bus company's motion for summary judgment. Because the elements necessary to prove intentional infliction of emotional distress are the same whether the defendant is a common carrier or not, and because this conduct did not amount to an extreme outrage, we affirm.

### A.

### Background

[¶ 2.] Plaintiff Landers Harris, a 65–year–old African American, purchased a ticket for a trip on Jackrabbit Bus Lines from Sioux Falls, South Dakota, to Wichita, Kansas.[1] At 12:30 a.m., on October 1, 2000, the bus was hit broadside by another vehicle within the city limits of Sioux City, Iowa.[2] As the bus could not be moved

Richard A. Engels of Abourezk Law Offices, Sioux Falls, South Dakota, Attorneys for plaintiff and appellant.

Michael A. Hauck of Bangs, McCullen, Butler, Foye & Simmons, Sioux Falls,

---

1. Jackrabbit Bus Lines is the business name of Jefferson Partners, a limited partnership registered in Delaware and headquartered in Minnesota.

2. The bus was proceeding northbound along Jackson Street and, having the right of way, was more than half way through the intersection with 5th Avenue, when an eastbound vehicle driven by one Sap Ung, a Nebraska

from the scene of the accident, the driver, Leonard Biever, instructed the passengers to walk a distance of some two blocks to the bus station to arrange for alternate transportation to their respective destinations. Harris, however, had suffered a groin injury in the collision and was unable to walk even so short a distance. In pain, Harris asked Biever to call an ambulance. Biever refused, telling Harris that he had already called the police and that Harris should sit on the curb and await their arrival. Paramedics from the Sioux City Fire Department soon arrived at the scene of the accident. After they checked Harris's blood pressure and found it elevated, they called for an ambulance to take him to the emergency room at Mercy Medical Center.

[¶ 3.] At the hospital, Harris complained of testicular pain. He was given Tylenol and released. Following his treatment, Harris waited in vain for someone from Jackrabbit to call to tell him what arrangements could be made to allow him to continue his trip or to return to Sioux Falls. Some four hours later, Harris, through his own efforts, learned the departure time of the next bus travelling from Sioux City to Sioux Falls. Again, through his own efforts, Harris arranged transportation to the Sioux City bus terminal only to learn that Jackrabbit would not furnish him a free ride back to Sioux Falls. Injured, through no fault of his own, in a collision that occurred while he was a passenger on a common carrier, and unable to continue his journey to Kansas, Harris had to purchase a ticket to return to his home town.

[¶ 4.] Harris retained an attorney who initiated negotiations with the insurance company for the person who collided with the bus. Upon reaching a settlement, Harris signed a release. Under the terms of the release, Harris forever discharged the driver and his insurance company, as well as "all other persons, firms or corporations liable or, who might be claimed to be liable ... from any and all claims" for injuries he suffered in the accident. Afterwards, Harris brought a negligence action against Jackrabbit, alleging specifically that the company had breached the duty of care owed by a common carrier to its passengers and listing the several indignities he suffered after the accident. Harris's complaint did not allege the tort of intentional infliction of emotional distress (IIED). Jackrabbit answered, averring, among other things, that it was not strictly liable to Harris for safe passage and that neither it nor its agents were in any way negligent.

[¶ 5.] Jackrabbit moved for summary judgment, asserting, first, that, as to Jackrabbit's liability to Harris, there was no material fact at issue, and, second, that the release Harris signed effectively discharged Jackrabbit from additional liability. On June 18, 2001, the circuit court held a hearing on Jackrabbit's motion for summary judgment. At the same time, Harris moved to amend his complaint to add a cause of action for IIED. His motion was granted, and he later served an amended complaint. Then, on July 19, 2001, the court ruled on three issues: first, South Dakota law governed the interpretation of the release and, second, in accordance with our decision in *Flynn v. Lockhart*, 526 N.W.2d 743, 745–46 (S.D.1995), the release was effective to bar all claims asserted against Jackrabbit as a joint tortfeasor with the driver who collided with the bus. Thus, the court dismissed the negligence action. On the third issue, the suit for IIED, the court ordered additional briefing. The court observed that although the parties had briefed the IIED question, the plaintiff had not explained

resident, entered the intersection against a red light and crashed into the bus.

how his claim that a common carrier must exercise a higher degree of protection for its passengers relates to his suit for IIED. Harris submitted a supplemental brief and a second affidavit in which he repeated facts already in the record (a summary of which has been provided above) and, in addition, explained how Jackrabbit's conduct subsequently affected him.

[¶ 6.] Following these submittals, the court issued its final memorandum opinion in September. In that decision, the court ruled that Harris had failed to establish two of the four elements of IIED required under South Dakota law, despite Harris's argument that, as a common carrier, Jackrabbit was expected to meet a higher standard of care.

[¶ 7.] On appeal, Harris brings the following issues: (1) "Whether the trial court violated SDCL 15–6–56(c) when it granted summary judgment to the defendant on the issue of IIED without holding any hearing after the date that a cause of action for IIED was added to this case." (2) "Whether the trial court erred in its grant of summary judgment when it ruled that Jackrabbit's conduct toward Harris was not outrageous and reckless." (3) "Whether Jackrabbit, as a common carrier, owes a greater duty of care to its passengers, which additional duty has a bearing upon establishment of the elements of IIED." We consider Issues 2 and 3 together.

## B.

### Failure to Hold Second Summary Judgment Hearing

[¶ 8.] Harris argues that SDCL 15–6–56(c) requires that a separate hearing be held on the IIED cause of action, a claim that did not appear in his initial complaint and could not, therefore, have been addressed in the June 18 hearing. Our summary judgment statute provides, in part:

> The motion shall be served at least ten days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

SDCL 15–6–56(c). Harris concludes that the court erred in failing to hold a second hearing on the IIED cause of action.[3]

[¶ 9.] This argument is without merit. To hold otherwise, we would require trial courts to conduct supplemental summary judgment hearings, even when the parties have nothing to add. All the relevant facts were before the court at the time it made its final decision, and the matter had been fully briefed by counsel, with both initial and supplemental briefs. Furthermore, counsel points to nothing that could have been submitted at a hearing that was not already before the court. This is ample confirmation that the parties had nothing further of substance to offer on the subject. Accordingly, the circuit court did not violate SDCL 15–6–56(c).

## C.

### Extreme and Outrageous Conduct by Common Carrier

[¶ 10.] Harris contends both that Jackrabbit committed the tort of IIED and

---

3. Our settled standard of review for summary judgments has been set out in numerous cases and need not be recited again here. *See Kobbeman v. Oleson*, 1998 SD 20, ¶ 4, 574 N.W.2d 633, 635. As statutory interpretation is a question of law, we review statutes without deference to the circuit court's interpretation. *Satellite Cable Servs., Inc. v. Northern Elec. Coop., Inc.*, 1998 SD 67, ¶ 5, 581 N.W.2d 478, 480.

that this tort is "altered by the fact that Jackrabbit is a common carrier." Although he conceded to the circuit court that the traditional elements of IIED are not changed when applied against a common carrier, he contends that Jackrabbit owed a greater duty of care to its passengers because "conduct that may not be outrageous or reckless if done by a member of the public in general may very well be outrageous and reckless if done by a common carrier to a passenger." Harris cites no authority for this proposition. We think these arguments confuse the elements of two different torts: IIED and gross insult.

[¶ 11.] We begin by examining the tort of IIED. The tort is proved by establishing that the defendant (1) by extreme and outrageous conduct, (2) acted intentionally or recklessly to cause the plaintiff severe emotional distress, (3) which conduct in fact caused the plaintiff severe distress, and (4) the plaintiff suffered an extreme, disabling emotional response to the defendant's conduct. *Henry v. Henry,* 2000 SD 4, ¶ 6, 604 N.W.2d 285, 288. The question whether the defendant's conduct was extreme and outrageous is initially for the trial court. *Richardson v. East River Elec. Power Coop.,* 531 N.W.2d 23, 27 (S.D.1995). Comment d to the Restatement (Second) of Torts § 46 (1965) explains that recovery is permissible only where the actor's conduct was "extreme and outrageous." Proof under this tort must exceed a rigorous benchmark. The conduct necessary to form intentional infliction of emotional distress must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized com-

munity." *Id. See Stene v. State Farm Mut. Auto. Ins. Co.,* 1998 SD 95, ¶ 32, 583 N.W.2d 399, 404; *Tibke v. McDougall,* 479 N.W.2d 898, 906–07 (S.D.1992). Liability for this tort will "not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." Restatement (Second) of Torts § 46 cmt. d.

[¶ 12.] On the other hand, the tort of gross insult is defined in the Restatement (Second) of Torts § 48 (1965). To establish the claim, a plaintiff must prove that (1) the plaintiff was a patron using a common carrier's facilities; (2) the plaintiff received "gross insults" from the carrier's servant, acting in the scope of employment; and (3) the gross insults must be reasonably deemed to be offensive. *Id.* The comments provide further explanation.

> *Any public utility* may of course be liable for the infliction of severe emotional distress by extreme and outrageous conduct, under the rule stated in § 46. The rule stated in this Section goes further and makes such a defendant *liable for conduct which falls short of extreme outrage, but is merely insulting.*

*Id.* at cmt. c (emphasis added). Of course, the rule in § 48 "does not extend to mere trivialities"; however, "the obvious condition of the plaintiff must . . . be taken into account in determining whether the conduct is grossly insulting. . . ."[4] *Id.*

[¶ 13.] Ample case law in other jurisdictions supports § 48's special rule for common carriers. *Bricks v. Metro Ambulance Serv., Inc.,* 177 Ga.App. 62, 338 S.E.2d 438, 443 (1985); *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America,* 6 Ohio

---

4. Thus, "language addressed to a pregnant or a sick woman may be actionable where the same words would not be if they were ad-

dressed to a United States Marine." Restatement (Second) of Torts § 48 cmt. c.

St.3d 369, 453 N.E.2d 666 (1983). "Insults amounting to less than extreme outrage are actionable only when the defendant enjoys a special relationship to the plaintiff that compels a higher than normal duty of care, as when the defendant is a common carrier, innkeeper, or public utility...." *Waldon v. Covington*, 415 A.2d 1070, 1076, n. 21 (D.C.App. 1980); *Haser v. Pape*, 77 N.D. 36, 39 N.W.2d 578, 581 (N.D.1949).

■ [¶ 14.] The key difference between the torts of IIED and gross insult is that IIED, *per* § 46, covers "extreme and outrageous conduct intentionally or recklessly caus[ing] severe emotional distress," whereas § 48 covers "gross insults" that reasonably offend a common carrier's patrons. The question, then, becomes which tort did Harris plead?

■ [¶ 15.] Count Two of Harris' amended complaint is captioned "IIED." The pertinent passages from the complaint (with emphases added) are as follows:

13. Defendant's agents *recklessly* provided no assistance to Plaintiff, leaving him, in his injured state, to fend for himself in an unfamiliar town at night.

19. The Defendant, holding itself out as a public transport company, had a *duty to use the highest degree of care* to establish and implement procedures to effectively meet passengers' medical, transportation and other needs in the event of a foreseeable emergency such as a collision.

20. *Defendant failed in that duty*, resulting in Plaintiff's emotional injuries.

21. The Defendant's *utter indifference* to Plaintiff's requests for help, and Defendant's complete failure to offer any kind of assistance whatsoever at any point in time after the accident ... constitutes *extreme and outrageous conduct*.

22. The Defendant's *extreme and outrageous conduct* caused the Plaintiff to suffer severe emotional distress....

23. The Defendant's *extreme and outrageous conduct* caused the Plaintiff to suffer an extreme disabling emotional response....

24. Plaintiff has undergone pain and suffering both of body and of mind as a result of Defendant's *negligence*.

[¶ 16.] Aside from the irrelevant mention of negligence, Harris's amended complaint speaks explicitly and unequivocally of "extreme and outrageous conduct" and *not* of "gross insults." Nonetheless, the complaint does speak of the higher duty of care that a common carrier owes its passengers and does allege that Jackrabbit breached that duty. Under our liberal pleading rules, this would perhaps be sufficient to allege the tort of gross insult. However, in his appellate brief, Harris asserts that this higher duty of care "has a bearing upon establishment of the elements of IIED." Nowhere in his brief does Harris even mention § 48, nor does he direct us to any cases that would support a claim that Jackrabbit committed the tort of gross insult. Thus Harris's cause of action cannot be understood otherwise than as a claim of IIED, which allows for no common-carrier exception.

■ [¶ 17.] For Harris to prevail on his IIED claim, the conduct of Jackrabbit personnel would have to be extreme and outrageous, committed intentionally or recklessly, in order to satisfy the first and second elements of that tort. Viewing the facts in a light most favorable to Harris, we consider the following: (a) Harris's obvious condition (his injury, his

minority status, and his age) and (b) the onerousness, under the circumstances, (i) of responding to his request to call for an ambulance, (ii) of providing him transportation back to the Sioux City bus station, and (iii) of giving him free passage back to his home. The question is whether the conduct of Jackrabbit's personnel (particularly that of driver Biever) was an extreme outrage.

[¶ 18.] It is true, as Professors Prosser and Keeton explain, that one "basis on which extreme outrage can be found is the defendant's knowledge that the plaintiff is especially sensitive, susceptible and vulnerable to injury through mental distress at the particular conduct." The Law of Torts, Ch. 2, § 12, 62 (5th ed 1984). Nonetheless, even taking into account Harris's injured condition, we cannot say that this conduct was "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Tibke*, 479 N.W.2d at 907. It was inconsiderate behavior, perhaps even callous indifference, but it was not an extreme outrage. It follows that the circuit court, correctly finding no reason to depart from the standard formulation of the elements of IIED, required Harris to bear the appropriate burden of proof.

[¶ 19.] Affirmed.

[¶ 20.] GILBERTSON, Chief Justice, and SABERS, and ZINTER, Justices, and AMUNDSON, Retired Justice, concur.