2003 SD 99

CITIBANK (S.D.), N.A., Plaintiff
and Appellant,

v.

Tonette L. HAUFF, Defendant, Third–
Party Plaintiff and Appellee,

v.

David Hauff, Third–Party Defendant.

No. 22664.

Supreme Court of South Dakota.

Argued May 29, 2003.

Decided Aug. 13, 2003.

Roberto A. Lange of Davenport, Evans, Hurwitz and Smith Sioux Falls, SD, for plaintiff and appellant.

Robert Gusinsky of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, SD, for defendant, third-party plaintiff, and appellee.

ZINTER, Justice.

[¶1.] While Tonette Hauff and David Hauff were married, Tonette applied for and received a Citibank credit card account. Although it was Tonette's account, she authorized David to obtain a card and become an authorized user of her account. In preparation for their subsequent divorce, Tonette and David paid off the account. After the divorce, the credit cards expired, Tonette left the marital home, but Citibank sent renewal cards to Tonette at that home. Without telling Tonette, David fraudulently took possession of the new cards, he activated them through a telephone call with Citibank, and he made charges using the new cards. Citibank subsequently commenced an action against Tonette for the charges made by David with the new cards he activated. Tonette denied that she was liable, and she counterclaimed for intentional infliction of emotional distress and barratry. The circuit court granted Tonette's motion for summary judgment against Citibank on the collection action. The court denied Citibank's motion for summary judgment against Tonette on her counterclaim. Citibank appeals both rulings. We affirm the summary judgment against Citibank on its collection action, and we reverse the circuit court's denial of summary judgment for Citibank on Tonette's counterclaim.

## FACTS AND PROCEDURAL HISTORY

[¶2.] Tonette applied for and obtained a credit card account from Citibank. Although it was Tonette's account, she authorized her husband David to obtain an addi-

tional card and become an authorized user of the account.

[¶ 3.] In 1998, Tonette and David were in the process of getting a divorce. In preparation for the divorce, Tonette contacted Citibank to determine the amount required to pay off the account. Tonette and David subsequently obtained a home equity loan from Black Hills Federal Credit Union (BHFCU) to pay off three different credit cards, including the Citibank account.

[¶ 4.] The parties disagree whether the account was closed when the balance was paid from the proceeds of the home equity loan. Citibank contends that it did not receive a required written notice that Tonette wished to close the account. A BHFCU home equity loan checklist also failed to indicate that the credit union sent a written notice to close the account when the loan proceeds were advanced. However, Carolie Zacher, the BHFCU employee who handled the home equity loan, testified (by affidavit) that she may have sent a termination letter without indicating so on the checklist. Additionally, Hauff's' other accounts were closed when BHFCU made the loan to pay off the accounts.

[¶ 5.] It also appears that prior to Citibank's receipt of the payoff, Tonette told Citibank that she wanted the account closed. This occurred during a collection call Citibank made to Tonette. The parties agree that during the call, Tonette informed Citibank that the account would soon be paid off and that she wanted the account closed. Citibank, however, contends that its representative told Tonette that she would have to call a customer service number to close the account. Tonette testified (by affidavit) that she did not remember being told that she had to

call customer service. Tonette testified that after this conversation and the payment from BHFCU, she believed that the account was closed. However, the account was not closed.

[¶ 6.] After the divorce, Tonette moved from the marital home, and David resided there. Although Tonette's "account" was not closed, it is undisputed that on their face, the plastic credit cards expired in the fall of 1998. However, pursuant to a Citibank internal procedure, it sent renewal cards to Tonette at the former marital residence.[1] David opened Tonette's letter, found the new cards, and Citibank permitted him to "activate" them by a telephone call. David subsequently made the charges at issue using the new cards. David did all of these acts without Tonette's knowledge or permission.

[¶ 7.] Tonette first learned that her ex-husband made these charges in May 1999. When Citibank called Tonette to collect for the charges, Tonette informed Citibank that she and David were divorced, and that she thought the account had been closed in July 1998. Citibank immediately closed the account upon receiving Tonette's information.

[¶ 8.] Tonette refused to pay Citibank for the charges made by David. Citibank eventually brought this collection action naming only Tonette as a party.[2] Tonette filed a counterclaim alleging intentional infliction of emotional distress and barratry. Tonette also filed a third party complaint against David.

[¶ 9.] After substantial discovery, the circuit court granted Tonette's motion for summary judgment on the collection action. The circuit court denied Citibank's motion for summary judgment on Tonette's counterclaim for intentional inflic-

---

1. Tonette had not informed Citibank of a change in address.

2. The record reflects that Citibank unsuccessfully attempted to collect from David.

tion of emotional distress and barratry. The circuit court certified its decisions as final orders under SDCL 15–6–54(b).[3] Citibank now appeals both decisions raising two issues, which we restate as follows:

1. **Whether under the terms of the credit card agreement, an "account holder" is liable for charges made by an "authorized user" when the "account holder's" authorized cards had expired on their face, and Citibank permitted the non-account holder to activate new renewal cards.**

2. **Whether Citibank was entitled to summary judgment on Tonette's counterclaims for intentional infliction of emotional distress and barratry.**

## DECISION

■■■ [¶ 10.] Our standard of review of summary judgment is well settled.

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and [established] entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party[,] and reasonable doubts should be resolved against the moving party.... Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.

*Braun v. New Hope Township*, 2002 SD 67, ¶ 8, 646 N.W.2d 737, 739 (quoting *South Dakota State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.*, 2000 SD 116, ¶ 9, 616 N.W.2d 397, 400–01).

[¶ 11.] 1. **Under the terms of the credit card agreement, an "authorized user," who was not the "account holder," was not entitled to activate newly issued renewal cards thereby subjecting the "account holder" to liability for subsequent unauthorized charges on the new cards.**

■■■ [¶ 12.] A credit card contract is similar to an insurance contract in that it is negotiated and prepared exclusively by the issuer. "[C]onsequently, it should be construed narrowly against the creditor.... This rule blends two independent canons of construction: first, ... a contract is interpreted against its drafter and second, ... a contract of adhesion should be strictly construed." *Gray v. American Exp. Co.*, 743 F.2d 10, 18 (D.C.Cir.1984) (internal citations omitted). Consequently, in cases like this, where liability between a cardholder and the account holder is not clear, courts have construed the agreement strictly against the credit card issuer who drafted the agreement. *Cleveland Trust Co. v. Snyder*, 55 Ohio App.2d 168, 380 N.E.2d 354, 360 (1978).

We will not, however, "seek out a strained or unusual meaning for the benefit of [one party]." (citations omit-

3. SDCL 15–6–54(b) provides:
When multiple claims for relief or multiple parties are involved in an action, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or

other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

ted). We read and understand ... contracts "according to the natural and obvious import of the language, without resorting to subtle and forced construction or the purpose of either limiting or extending their operation." (citations omitted).

*Dakota, Minnesota & Eastern R.R. Corp. v. Heritage Mut. Ins. Co.,* 2002 SD 7, ¶ 11, 639 N.W.2d 513, 515–16 (quoting *Farm and City Ins. v. Estate of Davis,* 2001 SD 71, ¶ 6, 629 N.W.2d 586–87).

[¶ 13.] Applying these principles of construction, we believe that the terms of the Citibank agreement control the disposition of this dispute.[4] In that agreement, Citibank created two separate and distinct classifications of users. That distinction is seen in the burdens and privileges given the "account holder," but denied to a mere "authorized user" in the "Additional Cards" provision of the agreement. That provision allowed an account holder like Tonette to name another person as an authorized *user* of the card. However, the authorized user's privileges were specifically limited to the right of access and use of *"the card"* and account. The agreement did not also make an authorized user an "account holder," nor did it grant the authorized user any of the other rights that the owner of the account possessed. The Additional Cards provision simply provided:

> *You* may request additional cards on *your account* for yourself or others and *you* may permit *another person* to have *access* to *the card* or account number. However, if *you* do, *you* must pay us for all charges made by those persons, including charges for which *you* may not have intended to be responsible. *You*

must notify us to revoke permission for any person *you* previously authorized *to use your account.* If *you* tell us to revoke another person's *use of your account,* we may close the account and issue a new card or cards with a different account number. *You* are responsible for the use of **each card issued on your account** according to the terms of this Agreement.

(emphasis added).[5]

[¶ 14.] Thus, under the agreement, an "authorized user" was only given the privilege to access and use the account and card authorized *by the account holder.* Moreover, only the account holder was responsible for the account. This language does not suggest that non-account holders had contractual authority to exercise the account holder's ownership right of authorizing the issuance of new cards. Therefore, we see no contractual authorization for a mere user to effectively exercise the account holder's ownership right to authorize new renewal cards at a time when the only authorized cards had expired on their face.

[¶ 15.] This conclusion is supported by Citibank's own testimony. Randy Neal, a Citibank representative, acknowledged the distinction between an account holder and an authorized user. He also conceded that an authorized user could not exercise all rights of the account holder. The owner's reserved rights included such things as changing the account's "PIN" number or requesting a credit line increase: things usually associated with ownership rights.

[¶ 16.] Terry Ryning, another Citibank representative, specifically testified about the right to authorize new cards after expi-

---

4. The agreement resolves the dispute in favor of Tonette even assuming, as we must do on a motion for summary judgment, that Tonette did not successfully close her account.

5. "[Y]ou, your, and yours," were defined as the *account holder* (rather than a mere user). The account holder was responsible for the account.

ration. He acknowledged that "[the agreement] does not say that" an authorized user can activate new renewal cards.

> Attorney: Do you know where in this document it allows a secondary cardholder to reopen, open or activate a card?
>
> Neal: Offhand I could—I would say I don't know where specifically, if anywhere, it would say that or address that.

Instead, Neal indicated it was only Citibank's internal procedures that allowed an authorized user to activate renewal cards after the only cards that the account holder had authorized had expired. Moreover, Neal conceded that the account holder was not notified of this internal procedure.

[¶ 17.] The trial court also focused on this absence of contractual authority for an authorized user to activate renewal cards when the only authorized cards had expired. The trial court specifically questioned whether there was any language in the agreement that authorized a mere user to activate a new card after the authorized card had expired:

> Judge: Was there any representation that [Tonette] okayed the use of that card, the activation of the new card?
>
> Counsel: Certainly okayed the use of the *account* by David Hauff. *The activation of new cards, no.* That call was by David Hauff.
>
> Judge: My question is I want some authority, if you can find some anywhere, first of all, just from Citibank, *that a person not responsible for the debt, for the account, can activate cards.* Is there *anything in writing anywhere* that you know of in Citibank's records *that allows that?*
>
> Counsel: Other than the additional cards and closing your account, *I'm not aware of it.*

(emphasis added).

■ [¶ 18.] Like the trial court, we find no authority in the agreement for a non-account holder, whose rights are limited to *use* of a validly issued card, to also possess the account ownership right to activate new cards at a time when the only authorized cards were expired. We reach that conclusion noting that a contract may consist of several writings and all writings must be read together to determine the terms of the agreement. *See generally, Aamot v. Eneboe,* 352 N.W.2d 647, 650 (S.D.1984). Therefore, the expiration language on the original cards was as much a part of the total agreement as the "Additional cards" provision. That expiration language, when coupled with the language distinguishing account holders from mere users, protected Tonette. It protected her because David was not authorized to in effect issue new cards by activating renewal cards on an account that only had expired cards outstanding.

[¶ 19.] We acknowledge Citibank's argument that the "card" may have expired for "internal purposes," but under the written agreement, the "account" remained open. Nevertheless, as noted above, the entire agreement between the parties included the language on the card itself, and that language indicated that the only authorized card had expired. We hesitate to believe that David would have been able to make these charges with the expired cards, or that if he had, Tonette would have been liable for such charges. Therefore, even if Tonette did not comply with the technical requirements to close her "account," the agreement, including the expiration language on the card itself, was sufficient to prevent David from circumventing use of his expired card.

■ [¶ 20.] We conclude that the language of a credit card contract, as a contract of adhesion, must be narrowly construed against the creditor as the drafter

of the agreement. *Gray v. American Exp. Co.*, 743 F.2d 10, 18 (D.C.Cir.1984). Here, there was no language in the agreement that explicitly or impliedly allowed an "authorized user" to activate newly issued renewal cards. Because David's card had expired, and because Citibank allowed a non-account holder to activate renewal cards not authorized by Tonette or the agreement, the account holder was not liable for the subsequent unauthorized charges.

[¶ 21.] **2. Citibank was entitled to summary judgment on Tonette's counterclaim for intentional infliction of emotional distress and barratry.**

[¶ 22.] The circuit court denied Citibank's motion for summary judgment on Tonette's counterclaim. The merits of the motion were not addressed by the court because it wanted to wait for our ruling on the validity of Citibank's collection action. Nevertheless, the summary judgment facts were fully developed and submitted. Because the summary judgment record was fully developed, we consider whether that record supports Tonette's counterclaim for intentional infliction of emotional distress or barratry.

### Intentional Infliction Of Emotional Distress

[¶ 23.] A party must prove four elements to establish a claim for intentional infliction of emotional distress.

> The tort is proved by establishing that the defendant (1) by extreme and outrageous conduct, (2) acted intentionally or recklessly to cause the plaintiff severe emotional distress, (3) which conduct in fact caused the plaintiff severe distress, and (4) the plaintiff suffered an extreme, disabling emotional response to the defendant's conduct.

*Harris v. Jefferson Partners, L.P.*, 2002 SD 132, ¶ 11, 653 N.W.2d 496, 500.

[¶ 24.] It is for the court to initially determine whether a party's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery. *Id.; Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 429 (S.D. 1994). We have defined "extreme and outrageous conduct" as "conduct exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind." *Richardson v. East River Elec. Power Coop., Inc.*, 531 N.W.2d 23, 27 (S.D.1995) (quoting *Tibke v. McDougall*, 479 N.W.2d 898, 907 (S.D.1992)).

> For conduct to be "outrageous," it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Tibke*, 479 N.W.2d at 907 (further citations omitted).

[¶ 25.] The conduct that Tonette relies upon to support her intentional infliction of emotional distress claim does not rise to this level: it only involves collection contacts reasonably made by collecting creditors. The first allegedly offensive contacts involved collection calls at Tonette's place of employment after Tonette had retained an attorney who had written to Citibank. According to Tonette, the Citibank collection representative was a person named Sherry. After Sherry called Tonette, Tonette initiated a return call to Sherry to find out what progress had been made on collecting the account from David. Tonette argues that Citibank should not have contacted her after she retained counsel. However, the mere fact that the Citibank representative spoke with Tonette after Tonette had retained counsel does not support a claim for inten-

tional infliction of emotional distress. We believe that as a matter of law, these particular contacts were not "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*[6]

[¶ 26.] Tonette also asserts that Citibank collection representatives yelled, made her feel like a criminal, and threatened garnishment. Although Tonette and her friends testified that Tonette was very upset by these collection calls, a reasonable person is expected to be able to withstand some extent of collection activity.

> Extreme and outrageous conduct does not consist of mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. All persons must expect a certain amount of rough language and occasional inconsiderate or unkind acts.

SD Pattern Jury Instruction (civil) 145–06. *See also Harris,* 2002 SD 132, ¶ 11, 653 N.W.2d at 500.

[¶ 27.] Here, Tonette complains of conduct that is typical of collection activity found non-actionable. *See generally Wade v. Ford Motor Credit Co.,* 455 F.Supp. 147, 151–52 (D.Mo.1978). Therefore, even accepting Tonette's version of the collection calls, they were at the most, "indignities, threats, annoyances ... rough language and occasional acts that are definitely inconsiderate and unkind." They were not, however, "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Tibke,* 479 N.W.2d at 907.

[¶ 28.] Tonette finally argues that because the collection attempts continued for approximately two years, and because Citibank attempted to call her the day after her son passed away, Citibank's conduct was extreme and outrageous. Tonette relies on *Ruple v. Brooks,* 352 N.W.2d 652 (S.D.1984).

[¶ 29.] The facts of this case are materially distinguishable from *Brooks.* In *Brooks,* the defendant's conduct was much more egregious and unreasonable because *Brooks* acted with knowledge that the plaintiff had just suffered a traumatic event. Here, the only call to Tonette after her son's death did not reach her. Moreover, *Brooks* did not involve collection calls, but a series of obscene phone calls. In fact, that defendant pled guilty to "two counts of using a telephone to call another person with intent to terrorize, intimidate, threaten, harass, or annoy such person by using any obscene or lewd language or by suggesting any lewd or lascivious act contrary to SDCL 49–31–31." *Id.* at 653–54. Unlike *Brooks,* Citibank's conduct did not involve criminal conduct. Citibank's collection efforts were substantially different than the obscene phone calls in *Brooks.* The facts of this case are similar to those where we have found no intentional infliction of emotional distress.[7]

---

**6.** There is no prohibition on parties talking with one another even though they are represented by counsel. As stated in the comment to Code of Professional Conduct, Rule 4.2, "parties to a matter may communicate directly with each other." SDCL ch. 16–18 (appendix at Rule 4.2, Comment). This may, however, be a violation of the Fair Debt Collection Practices Act, 15 U.S.C.A. § 1692.

**7.** On several occasions, we have affirmed grants of summary judgment where the alleged conduct did not satisfy the "extreme and outrageous" standard. *Harris,* 2002 SD 132, ¶ 18, 653 N.W.2d at 501–02; *Richardson,* 531 N.W.2d at 27–29; *Nelson v. WEB Water Dev. Ass'n, Inc.,* 507 N.W.2d 691, 699 (S.D. 1993); *Speck v. Federal Land Bank of Omaha,* 494 N.W.2d 628, 633 (S.D.1993); *Tibke,* 479 N.W.2d at 907; *Mackintosh v. Carter,* 451 N.W.2d 285, 287 (S.D.1990); *Groseth Int'l,*

## Barratry

[¶ 30.] Civil barratry exists when a party brings a frivolous or malicious claim. SDCL 20-9-6.1 provides:

> Barratry is the assertion of a frivolous or malicious claim or defense or the filing of any document with malice or in bad faith by a party in a civil action. Barratry constitutes a cause of action which may be asserted by filing a pleading in the same civil action in which the claim of barratry arises or in a subsequent action. A claim of barratry shall be determined in the same manner as any other substantive cause of action asserted in that civil action.

[¶ 31.] "A frivolous action exists when 'the proponent can present no rational argument based on the evidence or law in support of the claim'.... To fall to the level of frivolousness there must be such a deficiency in fact or law that no reasonable person could expect a favorable judicial ruling.... [F]rivolousness 'connotes an improper motive or [a] legal position so wholly without merit as to be ridiculous.'" *Ridley v. Lawrence County Comm'n*, 2000 SD 143, ¶ 14, 619 N.W.2d 254, 259 (further citations omitted).

[¶ 32.] A malicious action is one brought for an improper, unjustifiable motive.

> "[A]n action is malicious if it 'is begun in malice, and without probable cause to believe it can succeed, and which finally

ends in failure.'" ... Malice "exists when the proceedings are instituted primarily for an improper purpose." An improper purpose occurs in situations where:

> the plaintiff in the original action was actuated by any unjustifiable motive, as where he did not believe his claim would be held valid, or where his primary motive was hostility or ill will, or where his sole purpose was to deprive the defendant of a beneficial use of his property or to force a settlement having no relation to the merits of the claim.

*Stratmeyer v. Engberg*, 2002 SD 91, ¶ 20, 649 N.W.2d 921, 926 (further citations omitted).

[¶ 33.] Although we hold today that Citibank did not have a legal claim against Tonette, Citibank's action was not frivolous or malicious. Citibank raised rational arguments based on the evidence and law in support of its claim. The discovery and briefing also reflect that the claim did not lack merit to the extent that no reasonable person could expect a favorable judicial ruling or that it was so wholly without merit as to be ridiculous. We finally see no evidence to support the notion that Citibank had an improper motive when it commenced its collection action against Tonette.

[¶ 34.] Consequently, we reverse the denial of Citibank's motion for summary

---

*Inc. v. Tenneco, Inc.*, 440 N.W.2d 276, 280 (S.D.1989).

> Furthermore, in the cases where we have reversed summary judgments because there was extreme and outrageous conduct, the facts were far more outrageous than those at issue here. *See Reeves v. Reiman*, 523 N.W.2d 78 (S.D.1994) (while plaintiff was nude and intoxicated, defendant walked her down the hall in front of classmates and placed her alongside another male known to have a sexually transmitted disease);

*Kjerstad*, 517 N.W.2d 419 (employer used peep hole in restroom wall to view female employees using restroom); *Ruane v. Murray*, 380 N.W.2d 362 (S.D.1986) (landlord made sexual advances and subsequently harassed tenant whom he knew to have psychiatric problems); *Brooks*, 352 N.W.2d 652 (obscene phone calls were actionable where caller knew that plaintiff had recently endured traumatic experience at work including being fired).

judgment on the intentional infliction of emotional distress and barratry claims. We affirm the summary judgment in favor of Tonette on the collection claim.

[¶ 35.]  GILBERTSON, Chief Justice, KONENKAMP and MEIERHENRY, Justices, and JOHNS, Circuit Judge, concur.

[¶ 36.]  JOHNS, Circuit Judge, sitting for SABERS, Justice, disqualified.