2003 SD 148

**PRUDENTIAL KAHLER REALTORS,**
Plaintiff and Appellant,

v.

**James A. SCHMITENDORF and Dorothy C. Schmitendorf, Defendants and Appellees.**

**No. 22672.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 6, 2003.

Decided Dec. 23, 2003.

agreement expired, the Schmitendorfs sold the property to Michael Mitzel (Mitzel). Kahler then attempted to collect a commission for the sale, but the Schmitendorfs refused to pay on the grounds Kahler had not shown the property to Mitzel. Following a trial, the court agreed Kahler had not shown the property to Mitzel according to the meaning of the listing agreement and denied Kahler's claim for a commission. Because we believe this finding is not clearly erroneous, we affirm the trial court.

Jon J. Lafleur of LaFleur, LaFleur & LaFleur, P.C., Rapid City, South Dakota, Attorneys for plaintiff and appellant.

Jody H. Speck, Rapid City, South Dakota, Attorney for defendants and appellees.

GILBERTSON, Chief Justice.

[¶ 1.] James and Dorothy Schmitendorf (Schmitendorfs) entered into an exclusive listing agreement with Prudential Kahler Realtors (Kahler) for the sale of a printing business known as the Type Emporium. In the listing agreement, the Schmitendorfs agreed to pay Kahler a nine percent sales commission if the business was sold to any buyer to whom Kahler had shown the property. The listing agreement also contained a "tail" that obligated the Schmitendorfs to pay the commission if the property was sold within 360 days following the expiration of the agreement to anyone who was shown the property during the timeframe of the listing agreement. After the

## FACTS AND PROCEDURE

[¶ 2.] On August 15, 1998, the Schmitendorfs entered into an exclusive listing agreement with Kahler for the commercial property known as the Type Emporium. The agreement provided for a nine percent sales commission in the event the property was sold to anyone Kahler had shown the property. The listing agreement also contained a 360–day "tail" that obligated the Schmitendorfs to pay the commission if the property was sold within 360 days following the expiration of the agreement to anyone who was shown the property during the timeframe of the listing agreement.* The agreement expired on August 14, 1999.

[¶ 3.] On September 18, 1998, Joseph Graziano (Graziano) directed his realtor to gather information from Kahler concerning the Type Emporium. The Schmitendorfs and Kahler disagree as to whether

---

* Provision 6 of the Exclusive Listing Agreement provided:

> COMMISSION: If a purchaser is procured for the property by the Broker, by any other cooperating broker, by the seller, or by any other person at the price and upon the terms stated above, or at any other price or upon any other terms accepted by the Seller during the term of this Agreement or if exchanged or optioned during the term of

> this contract and said option is exercised, or if within, 360 days after the expiration of this agreement, the property is sold *to any person to whom the property was shown* the seller agrees to pay a commission of 9% of the sales price plus required sales taxes and applicable transaction fees, unless the property is listed with another cooperating broker at the time of such sale. (Emphasis added).

Graziano was actually fronting for Mitzel at this time, although it is clear Mitzel at least reviewed some relevant financial documents. Five days later on September 23, 1998, Graziano put forward an offer to purchase the Type Emporium for $200,000. On September 25, 1998, the Schmitendorfs made a counter-offer for $249,900. Shortly thereafter, Graziano indicated he was only willing to pay $225,000 for the business. Because neither side would compromise any further, the sale to Graziano was never consummated.

[¶ 4.] On August 3, 1999, the Schmitendorfs indicated they did not wish to renew the listing agreement with Kahler and asked for a complete list of those parties with whom Kahler had made contact during the listing period. Kahler responded by sending a partial list of contacts but indicated it would not be possible to put together a complete list because of the enormous amount of people he had made contact with during the listing period. This partial list included Graziano's realtor, but did not include Graziano or Mitzel.

[¶ 5.] On October 15, 1999, the Schmitendorfs sold the Type Emporium to Mitzel for $240,000. Mitzel obtained a loan from Graziano in order to pay the $50,000 down payment for the business. Shortly after the sale, Kahler contacted the Schmitendorfs seeking to collect a commission pursuant to the 360–day "tail" provision in the listing agreement. When the Schmitendorfs refused to pay the commission, Kahler sued the Schmitendorfs for nine percent of the sale price. After a trial before the court, the circuit court denied Kahler's claim on the grounds Kahler had not shown the property to Mitzel within the meaning of the listing agreement. In addition, the trial court held the 360–day "tail" to be invalid as an unreasonable restraint on the alienation of property and

found Kahler to be equitably estopped from claiming a commission because he failed to include Mitzel on the list of people to whom he had shown the property. Kahler appeals and raises three issues for our review:

1. Whether the trial court's finding that Mitzel was not shown the property is clearly erroneous.

2. Whether the 360–day provision found in paragraph six of the listing agreement is invalid as an impermissible restraint on the alienation of land.

3. Whether the doctrine of equitable estoppel prevented Kahler from claiming a real estate commission when he failed to

include Mitzel on the list of people shown the property.

### STANDARD OF REVIEW

[¶ 6.] We employ the clearly erroneous standard in reviewing a trial court's findings of fact. *City of Deadwood v. Summit, Inc.*, 2000 SD 29, ¶ 9, 607 N.W.2d 22, 25 (citing *New Era Mining Co. v. Dakota Placers, Inc.*, 1999 SD 153, ¶ 7, 603 N.W.2d 202, 204). Under this standard, "[c]lear error is shown only when, after a review of all the evidence, 'we are left with a definite and firm conviction that a mistake has been made.' " *Id.* (quoting *Dakota Placers, Inc.*, 1999 SD 153, ¶ 7, 603 N.W.2d at 204). We presume the trial court's findings of fact are correct "and we defer to those findings unless the evidence clearly preponderates against them." *Id.* We review conclusions of law de novo. *Id.*

[¶ 7.] The construction of a contract is a question of law reviewed under the de novo standard. *Kimball Investment Land, Ltd. v. Chmela*, 2000 SD 6, ¶ 10, 604 N.W.2d 289, 292 (citing *Cotton v. Manning*, 1999 SD 128, ¶ 15, 600 N.W.2d

585, 588). As we recognized in *Kimball* "[i]n determining the proper interpretation of a contract, a court is to seek to ascertain and give effect to the intention of the parties." *Id.*, ¶ 14 (additional citations omitted).

### ANALYSIS AND DECISION

[¶ 8.] **1. Whether the trial court's finding that Mitzel was not shown the property is clearly erroneous.**

[¶ 9.] The trial court denied Kahler's claim because it concluded Kahler had not shown the property to Mitzel within the meaning of the listing agreement. Kahler contends this finding is clearly erroneous and urges a more expansive interpretation of the word "shown." Although we are not required to read a contract in favor of a trial court's resolution, we believe the trial court employed the correct interpretation of "shown" under the circumstances. *Id.*, ¶ 10 (recognizing "this court can read a contract itself without a presumption in favor of the trial court's determination.").

[¶ 10.] Kahler asserts the Type Emporium was "shown" to Mitzel in September 1999, when Mitzel reviewed certain written materials including the financials provided by Graziano's realtor. The Schmitendorfs, however, assert Mitzel's review of the documents does not amount to a "showing" of the Type Emporium. In cases such as this one where the parties to a contract cannot agree on the interpretation of a word in the contract, this Court will apply the "plain and ordinary meaning" of the disputed term. *Opperman v. Heritage Mutual Insurance Co.*, 1997 SD 85, ¶ 4, 566 N.W.2d 487, 490 (citing *Economic Aero Club, Inc. v. Avemco Ins. Co.*, 540 N.W.2d 644, 645 (S.D.1995) (additional citations omitted)). The most common meaning of the word shown is "to cause or allow to be seen; display." AMERICAN HERITAGE COLLEGE DICTIONARY

1262 (3d ed.1997). With this simple definition in mind, we decline to accept Kahler's expansive reading of "shown" and agree with the trial court that Mitzel's review of documents relating to the Type Emporium did not equal a showing of the commercial property under the listing agreement.

[¶ 11.] The record also strongly suggests the trial court was not clearly erroneous in finding Kahler did not show the property to Mitzel. It is undisputed that Kahler never personally spoke with Mitzel, nor did he ever physically take Mitzel to inspect the business. At trial, Mitzel testified Graziano was not fronting him during Graziano's negotiations with the Schmitendorfs for the Type Emporium. In addition, although Kahler included Graziano's realtor on the list of contacts he provided the Schmitendorfs, Mitzel was not on the list. Under these circumstances, Kahler was not entitled to a commission for the sale of the Type Emporium, and we affirm the trial court.

[¶ 12.] **2. Whether the 360–day provision found in paragraph six of the listing agreement is invalid as an impermissible restraint on the alienation of land.**

**and**

[¶ 13.] **3. Whether the doctrine of equitable estoppel prevented Kahler from claiming a real estate commission when he failed to include Mitzel on the list of people shown the property.**

[¶ 14.] Because of our holding under Issue One that the trial court was not clearly erroneous in finding Kahler did not show the property to Mitzel, we decline to address Issues Two and Three.

[¶ 15.] SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

[¶ 16.] ZINTER, Justice, concurs in result.

ZINTER, Justice (concurring in result).

[¶ 17.] I agree with the Court that, as a matter of fact, Kahler did not "show" the property to Mitzel. I concur in result only because I do not agree that the definition of the word "show," as used in these listing agreements, always requires an on-site physical display of the property before a commission is earned. *See supra* ¶¶ 10–11 (defining show as "to cause or allow to be seen; display," and noting that Kahler never "physically" took Mitzel to inspect the business). In my view, there are circumstances under which a buyer could be shown a property without a physical on-site inspection. Indeed, in today's technological era, brokers show *and sell* property without a buyer's on-site physical inspection. It may be that a broker's production of the relevant financials, appraisals, building inspections, and visual reproductions are sufficient to sell property without a physical on-site display. I would not, therefore, hold as a matter of law that such listing agreements also require an on-site physical display of the property before it is deemed shown.