#23978-a-DG

**2006 SD 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

A-G-E CORPORATION,
a South Dakota Corporation,                                Plaintiff and Appellant,

   v.

THE STATE OF SOUTH DAKOTA,
by and through the STATE DEPARTMENT
OF TRANSPORTATION, a state agency,            Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
STANLEY COUNTY, SOUTH DAKOTA
\* \* \* \*

HONORABLE JAMES W. ANDERSON
Judge

\* \* \* \*

RONALD G. SCHMIDT of
Schmidt, Schroyer, Moreno
  Lee & Bachand PC
Rapid City, South Dakota                    Attorneys for plaintiff
                                            and appellant.

LAWRENCE E. LONG
Attorney General

WILLIAM J. NEVIN
Assistant Attorney General
Department of Transportation
Pierre, South Dakota                        Attorneys for defendant
                                            and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 23, 2006

OPINION FILED **07/19/06**

#23978

GILBERTSON, Chief Justice

[¶1.] A-G-E Corporation (A-G-E) entered into a road construction contract with the South Dakota State Department of Transportation (DOT) on a portion of U.S. Highway 83. DOT inspectors randomly spot inspected A-G-E's work after each layer of the road work was completed, and gave verbal approval for each subsequent level to be applied. While the final layer was being applied, the state engineer determined that the elevation and slope of the roadway was off between the randomly inspected locations and required A-G-E to tear off the layers and re-grade to contract specifications. A-G-E brought suit against DOT claiming waiver or estoppel precluded DOT from requiring A-G-E to perform additional work to correct the elevation and slope, as DOT's employees had verbally approved the application of subsequent layers after randomly spot inspecting the work. A-G-E also claimed the work was "extra work," or in the alternative "alterations," under the terms of the contract for which A-G-E should have received additional compensation. On competing motions for summary judgment, the circuit court held for DOT. We affirm.

## FACTS AND PROCEDURE

[¶2.] On May 6, 2003, A-G-E submitted a sealed bid to DOT for grading, structures and part asphalt course for 11.065 miles of U.S. Highway 83 in Stanley County, South Dakota. A-G-E was awarded the contract as the low bidder. The contract was subject to the *Standard Specifications for Roads and Bridges*, 1998

#23978

Edition (hereinafter SSRB), published by DOT, except for section 5.8, which was modified by a "Special Contract Provision for Contractor's Staking."[1]

[¶3.] Per the provisions of the contract, A-G-E conducted the surveying and setting of blue-top grading stakes (blue-tops)[2] at 100 foot intervals, using DOT's specifications for the required slope and grade. The grading portion of the project required A-G-E to 1) prepare the sub-grade (dirt), 2) lay the sub-base (salvage

_____

1. It should also be pointed out that clauses in the "Special Provision for Contractor's Staking" also made A-G-E responsible for the problems now in dispute, notwithstanding the fact that DOT may have randomly checked the slope and grade at various times before the project was completed. That provision provided:

> The Contractor shall perform all construction layout and reference staking necessary for the accurate control and completion of all . . . grading [and] . . . paving.
>
> The Contractor shall be solely responsible for the accuracy of the staking.
>
> Any deficient survey layout or staking that results in construction errors shall be corrected by the Contractor at no additional charge to the [DOT].
>
> The Engineer may check the accuracy and control of the Contractor's survey work at any time. The checks performed by the Engineer will not relieve the Contractor of the responsibility for the accuracy of the survey layout or the construction work.

   These contractual provisions clearly relieved DOT of responsibility for ascertaining the accuracy of the work in dispute until final notification of acceptance under SSRB § 5.16.

2. "Blue-tops" are grade stakes with a blue ribbon or blue spray paint at the top that are set at the desired elevation on the centerline as an aid for the contractor to blade the material to the required grade elevation.

material) to support the base course, 3) place the base course on the sub-base, and 4) place oil on top of the base course. Each layer was staked with blue-tops in order to achieve the correct slope, grade and depth of material per the provisions of the contract. The last layer required was an asphalt surface course, which was subcontracted by A-G-E with DOT approval.

[¶4.] The quantity of material necessary for each layer of the project was calculated based on the length, width, slope and desired grade elevation of the roadbed. A spreadsheet was used to determine the spread rate and was then included in the construction plans. DOT checkers reviewed the scale ticket of each A-G-E truck that brought material to the site, referred to the spread rate for the specific portion of the roadbed involved, and then directed the truck driver to dump the material over the prescribed length.

[¶5.] A-G-E was then responsible for equalizing the material in a windrow and then uniformly blading the material out to the required grade elevation and slope. The process was repeated for each truckload of material and for each layer of the project. A-G-E maintained its own checkers and inspectors on site during the project. However, the record does not indicate their function or what actions they took during the project.

[¶6.] After each layer was constructed, the state inspector assigned to the project checked the grade elevation and slope at randomly selected blue-tops. At each randomly selected blue-top that was inspected, the layers were found to be within the contract specifications. After each layer was inspected, the inspector verbally communicated to A-G-E an "okay" to proceed with the next layer. Once the first three layers were constructed, A-G-E placed the oil on top of the base course

and DOT issued written consent for the subcontractor to begin applying the final layer of asphalt surface.

[¶7.] The contract required the asphalt surfacing to be one to one and one-half inches in depth. Shortly after the asphalt layer was started, it was discovered that a substantially irregular depth of asphalt was being laid down by the paving subcontractor with up to five inches of asphalt being laid in some spots in order to achieve the proper grade and slope. It was subsequently discovered that the grade and slope between the 100-foot blue-tops along approximately the first two miles of roadway did not comply with the contract specifications.

[¶8.] A-G-E was then directed by the DOT engineer to rework the material between the 100-foot blue-tops along the two miles of roadway in order to bring the grade and slope in those areas into compliance with the contract specifications. A-G-E determined the manner in which to conduct the re-grading based on its experience, equipment and staffing. A-G-E hauled some excess gravel off site, stockpiled it and then brought the same gravel back onto the site to fill in low spots, and then re-graded the materials.

[¶9.] The quantity of materials used was neither increased nor decreased by DOT during the re-grading process. Nor did DOT alter the grade or alignment of the road from that shown in the original plans. At its own expense, DOT placed additional blue-tops every fifty feet longitudinally and every twelve feet across the width of the roadway to guide A-G-E's corrective work.

[¶10.] A-G-E filed suit in circuit court claiming $45,517.50 in damages. A-G-E alleged in its complaint that the expenses were incurred as a result of DOT's direction to remove excess gravel from high spots and fill low spots. A-G-E alleged

that DOT waived its rights under the contract to a final inspection by virtue of conducting the random blue-top inspections of each layer and giving a verbal "okay" to proceed with the next layer. A-G-E also alleged that the work required to re-grade the first four layers of the two-mile segment in question was "extra work," or alternatively "alterations," within the meaning of the DOT contract.

[¶11.] After DOT filed its answer, the depositions of Rick Gordon, engineering supervisor for DOT; Mark Peppel, the DOT project engineer who was supervised by Gordon; Rodney Larson, DOT senior transportation technician on the project, and Gary Johnson, president of A-G-E, were taken. A-G-E then moved for summary judgment, and DOT filed a cross-motion for summary judgment. On December 20, 2005, oral arguments were presented to the circuit court. The circuit court entered an order granting DOT's motion and judgment of dismissal on January 4, 2006.

[¶12.] On appeal, A-G-E raises two issues for this Court's review:

1. Whether the circuit court erred when it denied A-G-E's motion and granted DOT's motion for summary judgment.

2. Whether disputed material facts exist that require a reversal of the circuit court's order granting DOT's motion for summary judgment and a remand for trial on the matter.

We will address the issues in reverse order, as issue two is a threshold issue that determines whether the matter was appropriate for disposition via a motion for summary judgment.

## STANDARD OF REVIEW

[¶13.] Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). We will affirm the trial court's grant or denial of a motion for summary judgment when no genuine issues of material fact exist, and the legal questions have been correctly decided. *Titus v. Chapman*, 2004 SD 106, ¶13, 687 NW2d 918, 923 (citing *Holzer v. Dakota Speedway*, 2000 SD 65, ¶8, 610 NW2d 787, 791 (citing *Bego v. Gordon,* 407 NW2d 801, 804 (SD 1987))). We review the circuit court's conclusions of law under the de novo standard. *Id*. (citing *Sherburn v. Patterson Farms, Inc.*, 1999 SD 47, ¶4, 593 NW2d 414, 419 (citing *City of Colton v. Schwebach*, 1997 SD 4, ¶8, 557 NW2d 769, 771)). However, we view all evidence and favorable inferences from that evidence in a light most favorable to the nonmoving party. *Id*. (citing *Morgan v. Baldwin*, 450 NW2d 783, 785 (SD 1990)). We will affirm the circuit court on summary judgment if it is correct for any reason. *Westfield Ins. Co., Inc. v. Rowe*, 2001 SD 87, ¶4, 631 NW2d 175, 176 (citing *Estate of Juhnke v. Marquardt*, 2001 SD 26, ¶5, 623 NW2d 731, 732).

[¶14.]     In order to prevail on a motion for summary judgment, the nonmoving party "must present specific facts showing that a genuine, material issue for trial exists." *Stoebner v. South Dakota Farm Bureau Mut. Ins. Co.*, 1999 SD 106, ¶6, 598 NW2d 557, 558 (quoting *Weiss v. Van Norman*, 1997 SD 40, ¶9, 562 NW2d 113, 115) (citations omitted). "A disputed fact is not 'material' unless it would affect the outcome of the suit under the governing substantive law in that a 'reasonable jury could return a verdict for the nonmoving party.'" *South Dakota State Cement Plant Comm'n. v. Wausau Underwriters Ins. Co.*, 2000 SD 116, ¶9, 616 NW2d 397, 401

(quoting *Weiss,* 1997 SD 40, ¶11 n2, 562 NW2d at 116 n2 (quoting Parsons v. Dacy, 502 NW2d 108, 110 (SD 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 US 242, 248, 106 SCt 2505, 2510, 91 LEd2d 202 (1986)))).

[¶15.] "On appeal, this Court can read a contract itself without any presumption in favor of the trial court's determination." Icehouse, Inc. v. Geissler, 2001 SD 134, ¶7, 636 NW2d 459, 462 (quoting Thunderstik Lodge, Inc. v. Reuer, 1998 SD 110, ¶12, 585 NW2d 819, 822). Thus, the interpretation of a contract is a question of law, which is reviewed de novo. *Id.* (citing Mahan v. Avera St. Luke's, 2001 SD 9, ¶15, 621 NW2d 150, 154).

## ANALYSIS AND DECISION

[¶16.] **1.** **Whether disputed material facts exist that require a reversal of the circuit court's order granting DOT's motion for summary judgment and a remand for trial on the matter.**

[¶17.] As a threshold matter per the provisions of SDCL 15-6-56(c), summary judgment is appropriate when there is no genuine issue of material fact. SDCL 15-6-56(c). In addition, there must be no genuine issue on the inferences to be drawn from those facts. St. Paul Fire & Marine Ins. Co. v. Engelmann, 2002 SD 8, ¶15, 639 NW2d 192, 199 (citing Wilson v. Great N. Ry. Co., 83 SD 207, 212, 157 NW2d 19, 21 (1968)). A fact is material when it is one that would impact the outcome of the case "under the governing substantive law" applicable to a claim or defense at issue in the case. Schwaiger v. Mitchell Radiology Associates, P.C., 2002 SD 97, ¶7, 652 NW2d 372, 376 (citing South Dakota Cement Plant Comm'n, 2002 SD 116, ¶9, 616 NW2d at 376 (quoting Stoebner v. South Dakota Farm Bur. Mut. Ins. Co., 1999 SD 106, ¶6, 598 NW2d 557, 558)). When a material fact is in dispute, a trial is

required to resolve differing versions of the truth. *See* Hausch v. Donrey of Nevada, Inc., 833 FSupp 822, 825 (DNev 1993) (citing Admiralty Fund v. Hugh Johnson & Co., 677 F2d 1301, 1305-06 (9th Cir 1982); Admiralty Fund v. Jones, 677 F2d 1289, 1293 (9th Cir 1982)).

[¶18.]     In the instant case, A-G-E submitted a statement of undisputed material facts along with its motion for summary judgment. DOT submitted a response to A-G-E's statement of undisputed facts, along with its own statement of undisputed material facts in support of its cross-motion for summary judgment. A-G-E did not object to DOT's statement of genuine material facts. Nor did A-G-E argue below that genuine issues of material fact existed. Now on appeal, A-G-E asserts for the first time that such issues existed.

[¶19.]     This Court does not review issues raised for the first time on appeal. Cain v. Fortis Ins. Co., 2005 SD 39, ¶22, 694 NW2d 709, 714 (quoting Action Mech., Inc. v. Deadwood Historic Preservation Comm'n, 2002 SD 121, ¶50, 562 NW2d 742, 755). Therefore, this issue is not properly before the Court and will not be addressed.

[¶20.]     **2.     Whether the circuit court erred when it denied A-G-E's motion and granted DOT's motion for summary judgment.**

[¶21.]     A-G-E advances three arguments in support of its contention that the circuit court improperly granted DOT's cross-motion and denied its motion for summary judgment. A-G-E argues that DOT is subject to waiver, or in the alternative it is subject to estoppel as a matter of law. Third, A-G-E argues that the work required to re-grade the first four layers of the two-mile segment in question

was "extra work," or alternatively "alterations," within the meaning of the DOT

contract.

*Waiver*

[¶22.] "Waiver is a volitional relinquishment, by act or word, of a known, existing right conferred in law or contract." Harms v. Northland Ford Dealers, 1999 SD 143, ¶17, 602 NW2d 58, 62 (citing Wieczorek v. Farmers' Mut. Hail Ins. Ass'n of Iowa, 61 SD 211, 216-17, 247 NW 895, 897 (1933)). A waiver of a contractual right occurs "where one in possession of any [contractual] right . . . and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it[.]" Western Cas. and Sur. Co. v. American Nat. Fire Ins. Co., 318 NW2d 126, 128 (SD 1982) (quoting *Wieczorek*, 61 SD 211 at 216-17, 247 NW at 897 (quoting Noem v. Equitable Life Ins. Co., 37 SD 176, 180, 157 NW 308, 309 (1916))). We interpret contracts on appeal "according to the natural and obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operations." Citibank (S.D.), N.A. v. Hauff, 2003 SD 99, ¶12, 668 NW2d 528, 533 (citing Dakota, Minnesota & Eastern R.R. Corp. v. Heritage Mut. Ins. Co., 2002 SD 7, ¶11, 639 NW2d 513, 515-16 (quoting Farm and City Ins. v. Estate of Davis, 2001 SD 71, ¶6, 629 NW2d 586-87)).

[¶23.] A-G-E argues that DOT waived its contractual right to reject work identified at the final inspection by the engineer as nonconforming when the project inspector made his inspections at randomly selected blue-tops and gave a verbal "okay" to A-G-E to proceed to the next layer. A-G-E supports its argument by

#23978

arguing that DOT had a duty and opportunity to inspect the work as it progressed, and that A-G-E relied on the results of the inspections performed by the DOT inspector. A-G-E contends that each layer of the roadway was accepted by the conduct of the DOT inspector within the meaning of section 5.16 of the contract. A contrary interpretation, A-G-E argues, would result in the DOT inspector serving no viable function or purpose.

[¶24.] The relevant contract provisions are contained in DOT's *SSRB*. Section 5.10, titled Duties of the Inspector, provides:

> Department inspectors will be authorized to inspect all work done and materials furnished. This Inspection may extend to any part of the work, preparations, fabrications or manufacture of the materials to be used. *The Inspector is not authorized to alter or waive the provisions of the contract.* The Inspector is not authorized to issue instructions contrary to the Contract, or to act as a foreman for the Contractor. The Inspector will have the authority to reject work or materials until any issues can be referred to and decided by the Engineer.

(emphasis added). Section 5.1, titled Authority of the Engineer, provides:

> Work shall be performed to the satisfaction of the Engineer. The Engineer will decide questions which may arise as to the quality and acceptability of materials furnished, work performed, rate of progress of the work; all questions which may arise as to the interpretation of the plans and specifications; all questions as to the acceptable fulfillment of the contract on the part of the Contractor; and disputes between Contractors where it effects the progress of the work. The Engineer's decision shall be final.

Finally, section 5.16, titled Final Acceptance, provides:

> *When the contract work*, including authorized modifications and final cleanup *has been completed*, the Region Engineer or his designee, will within five days, exclusive of holidays, make a final inspection of the work. *When provided in the Contract, the Region Engineer or his designee may make inspections following completion of portions of the contract.* If the work is found to

> conform with the requirements of the Contract, the Region Engineer or his designee will issue written notification to the Contractor of acceptance by the Department of Transportation. Such notice is not to be construed as an acceptance by the Region Engineer or his designee of previously noted defective or unauthorized work, or of unauthorized work subsequently determined during the final computations of field measurements. Should the work fail to conform with requirements of the Contract, a written statement of the features to be remedied will be given the Contractor. Final acceptance will not be made until the Contractor advises the Engineer that the corrections have been made and the requirements have been met.

(emphasis added).

[¶25.] A-G-E's interpretation of the role of the DOT inspector is not controlling. A-G-E's argument that the DOT inspectors serve no purpose if it cannot rely upon their work as a measure of conformity with contract provisions is immaterial to A-G-E's duties under the contract. Whatever purpose DOT may have for utilizing inspectors is independent of A-G-E's duties under the contract. The contract language in section 5.10 merely notifies the contractor that it must permit the DOT inspector access to conduct any and all inspections that DOT requires.

[¶26.] It is the language of the contract that controls. The language permits the DOT inspector to inspect and reject work in progress. The contract does not authorize the DOT inspector to supervise, approve or accept work on behalf of DOT. Nor does the DOT manual require such work-in-progress inspections, or give assurance that such inspections eliminate the contractor's duties under the contract. In addition, section 5.10 specifically states that the inspector "*is not authorized to alter or waive the provisions of the contract.*" Only the DOT engineer

can effect final acceptance and relieve the contractor of further duties under the contract.

[¶27.] Furthermore, the contract language is clear that the entire project must substantially conform to its requirements, not just those portions of the project inspected by the DOT inspector while work is in progress. Section 5.3 of the DOT's *SSRB* provides:

> In the event the Engineer finds the materials furnished, work performed, or the finished product are not in reasonably close conformity with the plans and specifications resulting in an inferior or unsatisfactory product, the work or materials shall be removed and replaced or corrected by and at the expense of the Contractor.

[¶28.] A-G-E, as the contractor, had the duty to perform its work in conformity with "the lines, grades, cross sections, dimensions and material requirements, including tolerances, shown on the plans, specifications or other contract documents." *SSRB*, § 5.3 Conformity with Plans and Specifications. The fact that A-G-E elected to rely on the DOT inspector's random blue-top stake inspections as a means of determining whether it was in conformity with the contract requirements does not waive DOT's right to enforce the terms of the contract.

[¶29.] More importantly, A-G-E has not argued that DOT was aware that the grade and slope were not within project specifications at certain points between the blue-tops. This is significant because waiver requires a relinquishment of rights with "full knowledge of the material facts." Western Cas. & Sur. Co. v. American Nat'l Fire Ins. Co., 318 NW2d 126, 128 (SD 1982). There is no dispute in the record that neither party knew the work between the blue-tops did not conform to contract

specifications until after the DOT inspector had given a verbal "okay" to proceed to the asphalt surface course, the final layer in the construction process. Therefore, even though DOT randomly inspected the roadway between the blue-tops, waiver could not apply because there is no evidence that DOT had knowledge of the noncompliance between the blue-tops.

[¶30.] A-G-E's second argument under its waiver theory, that the interim inspections and partial payments for the earlier stages of the project constituted acceptance and "certification" that those portions of the roadway had been completed in conformance with the contract specifications under SSRT section 5.16, must also fail. SSRB section 5.16 generally deals with acceptance when "the contract work . . . has been completed." Although section 5.16 also contemplates some interim final acceptances, it does so only when interim acceptances are "provided in the Contract." A-G-E has not identified contract provisions authorizing interim final acceptance following partial completion of this contract. More importantly, even if the interim final acceptances were authorized by this contract, section 5.16 requires that the regional engineer must issue "*written* notification to the contractor of [the] acceptance. . . ." In this case, A-G-E has not indicated that DOT issued such *written* notifications of *acceptance* of the prior portions of the project.

*Estoppel*

[¶31.] A-G-E next argues DOT should be estopped from asserting any fault on the part of A-G-E for causing the needed rework. A-G-E argues it relied upon the DOT inspector's random blue-top inspections for assurance that it was in

compliance with the requirements of the contract. A-G-E concedes that the depth, slope and grade requirements were met at the randomly selected blue-tops inspected by the DOT inspector. It also concedes that the spread rate was not in error.

[¶32.] Under this Court's holding in *Western Casualty and Surety Co.*,

> To create an estoppel, there must have been some act or conduct upon the part of the party to be estopped, which has in some manner misled the party in whose favor the estoppel is sought and has caused such party to part with something of value or do some other act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his legal rights.

318 NW2d at 128 (quoting Somers v. Somers, 27 SD 500, 504, 131 NW 1091, 1093 (1911)). Estoppel will be applied against a party "who by their words or conduct take positions inconsistent with their rights, unfairly misleading others into detrimental reliance." *Harms*, 1999 SD 143, ¶17, 602 NW2d at 62 (citing *Western Casualty and Surety Co.*, 318 NW2d at 128 (citing *Somers*, 27 SD at 504, 131 NW at 1093)). It requires concealment, misrepresentation, or conduct at odds with known facts. *Action Mech., Inc.*, 2002 SD 121, ¶29, 652 NW2d at 751 (stating that representation or concealment of material fact must exist).

[¶33.] A-G-E cites to *Northern Improvement Co. v. South Dakota State Highway Comm'n*, 267 NW2d 208 (SD 1978), for the proposition that DOT waived its right to a final inspection by virtue of the inspector's verbal "okay" to proceed to the next layer. However, in that case the engineer ordered alterations to the original plans, required the contractor to use substandard material and poor construction techniques, and ordered additional work outside the scope of the

original contract. *Id.* at 210. After the work product failed to perform as originally envisioned under the contract, the commission refused to pay for the additional work. *Id.* It did so arguing that the contractor had failed to properly preserve its claim by complying with the written notice requirements under the contract. *Id.* at 211. This Court held that the broad supervisory authority of the engineer as contained in the 1968 version of the *SSRB* gave him authority to decide the manner in which the contractor performed its work. *Id.* at 214. That authority coupled with the contractor's frequent discussions with the resident engineer, district engineer and department engineer was sufficient to estop the state from claiming lack of written supplemental agreement, change order, or notice of claim so as to bar the contractor's claim for additional compensation. *Id.*

[¶34.] A-G-E cites to several other cases where state or city engineers were invested with broad supervisory authority to control the manner in which the contractor conducted the work. *See* City Street Improvement Co. v. City of Marysville, 155 Cal 419, 101 P 308 (1909); Schliess v. City of Grand Rapids, 131 Mich 52, 90 NW 700 (1902); Wilde v. Fractional School Dist. No. 1 of Paw Paw and Antwerp, 25 Mich 419 (1892); Laycock v. Moon, 97 Wis 59, 72 NW 372 (1897); Ashland Lime, Salt & Cement Co. v. Shores, 105 Wis 122, 81 NW 136 (1899). In these cases, the state or city engineers also had a duty to inspect that was clearly defined in the contract and ordered work to proceed despite the protests of the contractor that the work was deficient, or ordered additional or different work to be performed than what was original provided for in the contract. None of the cases cited by A-G-E support its assertion that the actions of an inspector without

authority to accept work as final, or to order changes to the contract, can estop DOT from enforcing section 5.16 on final acceptance.

[¶35.] In the instant case, the DOT inspector did not have similar broad authorities under the *SSRB* to supervise and direct the manner in which A-G-E completed the work. Section 5.10 made it unequivocally clear that the DOT inspector could not serve as foreman for A-G-E, nor alter or waive provisions of the contract. The DOT inspector did not order A-G-E to proceed to the next layer, but rather gave a verbal "okay" that the random inspections of blue-tops had not revealed any nonconforming work in a particular layer.

[¶36.] In addition, the DOT inspector did not falsely represent, conceal any material facts, or engage in any of the types of conduct that are required for equitable estoppel to apply. A-G-E concedes that the depth, grade and slope at the blue-tops were in compliance with the contract requirements. The defects in the project were discovered in areas that had not been inspected. Moreover, the defects in the project were not discovered by the inspector, but rather by the asphalt contractor when the depth of the asphalt layer began to vary widely by up to five inches. Therefore, just as is the case for waiver, estoppel could not apply because there is no evidence in the record that the DOT had knowledge of the noncompliance of those portions of the roadway between the blue-tops prior to the application of the final layer. *See supra* ¶29.

[¶37.] Finally, at the time the roadway layers were initially placed by A-G-E, the DOT inspector did not order additional or different work to be done than what was originally contemplated in the contract. Only after the nonconformity was

discovered was direction given by the DOT engineer to A-G-E to strip off layers and rework the materials to achieve the proper grade and elevation.

*Extra Work or Alterations*

[¶38.]    A-G-E's final argument is that the work required to bring the roadway slope and grade into conformity with the provisions of the contract was "extra work" or in the alternative "alterations" within the meaning of SSRB.  Section 4.3 of the *SSRB* defines "extra work."  It provides:

> The Contractor shall perform authorized work, for which there is no price included in the contract, whenever necessary or desirable in order to complete the work as contemplated.  Such work shall be performed in accordance with the specifications and as directed, and be paid for as provided under Section 9.5.

A-G-E argues the rework was authorized and necessary for the completion of the project to the satisfaction of the DOT engineer and not provided for in the contract.

[¶39.]    A-G-E's argument that the work conducted after the slope and grade were discovered to be nonconforming was for work for which there was "no price included in the contract."  A-G-E's argument lacks merit, as the contract language specified a price for the work required to achieve the specified grade elevation and slope for each of the four roadway layers.  All the work conducted by A-G-E after the discrepancy was discovered was more properly classified as rework for failure to achieve the contract specifications.  Therefore, section 4.3 does not apply.

[¶40.]    As to A-G-E's alterations argument, that subject is addressed in section 9.2 of the *SSRB*, and provides in relevant part:

> The Department reserves the right to make such increases or decreases in quantities and such alterations in the work within the general scope of the contract, including alterations in the grade or alignment of the road or structure or both, as necessary

-17-

> or desirable. Such increases or decreases and alterations shall not invalidate the contract nor release the surety. The Contractor agrees to accept the work as altered, as if it had been a part of the original contract.

[¶41.] No increase or decrease in the quantities of material was required by the DOT engineer during the rework phase of the project. In addition, the slope and the grade of the roadway were not altered from the original plans. Instead, the DOT engineer required A-G-E to rework the same quantity of materials on the nonconforming portions of the roadway in order to achieve the original slope and grade required under the contract. The rework did not alter the project as originally planned. It merely served to correct A-G-E's errors, which were due to either an inability or failure to monitor its own work.

[¶42.] The circuit court did not err when it granted DOT's motion for summary judgment. Therefore, we affirm on all issues. Affirmed.

[¶43.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.