#25091-rev & rem-JKM

**2009 SD 93**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

KJERSTAD REALTY, INC.,
a South Dakota Corporation,                                    Plaintiff and Appellee,

    v.

BOOTJACK RANCH, INC.,
a South Dakota Corporation,                                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MERTON B. TICE, JR.
Judge

\* \* \* \*

ALECIA E. FULLER
RICHARD A. PLUIMER of
Brady & Pluimer, P.C.                                    Attorneys for plaintiff
Spearfish, South Dakota                              and appellee.

JOHN K. NOONEY
AARON T. GALLOWAY of
Nooney, Solay & Van Norman, LLP                Attorneys for defendant
Rapid City, South Dakota                             and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON AUGUST 24, 2009

OPINION FILED **10/28/09**

#25091

MEIERHENRY, Justice

[¶1.]    Bootjack Ranch, Inc. appeals the circuit court's grant of summary judgment in favor of Kjerstad Realty, Inc. for a claimed sales commission associated with the sale of Bootjack Ranch. We reverse and remand for trial.

## BACKGROUND

[¶2.]    The president of Bootjack Ranch, Patricia Hanson, entered into an exclusive listing agreement with Jerald Kjerstad on behalf of Kjerstad Realty to sell Bootjack Ranch. The listing agreement was for one year from April 7, 2006, to April 7, 2007. The selling price for the 6,365 acre ranch located in Meade and Pennington Counties was listed at $3,658,000 cash. The agreement provided that Kjerstad Realty would receive a 5% commission if the property sold during the effective dates of the contract or "[i]f . . . within 180 days after the expiration of this contract, a sale is made to any person to whom the property has been shown during the listing period." Originally, Jerald Kjerstad was the responsible broker for the agreement and had personally negotiated its terms with Hanson. Because of Jerald Kjerstad's death on October 15, 2006, another realtor in Kjerstad Realty, Ron Ensz, became the agent for Hanson. On January 5, 2007, Hanson and Ensz amended the listing agreement to lower the listing price to $3,100,000.

[¶3.]    Later in January, Hanson informed Ensz that she intended to withdraw Bootjack Ranch from the market. On January 26, 2007, Ensz sent Hanson a letter acknowledging the removal of the ranch from the market. On March 13, 2007, Hanson's attorney notified Ensz in writing to verify that the listing agreement was terminated and that the 180-day tail provision only applied to two

interested buyers to whom Ensz showed the ranch. Ensz responded that he disagreed and that the 180-day tail provision applied to additional potential buyers, including Patrick Trask.

[¶4.] Approximately five months after Hanson terminated the listing agreement with Kjerstad Realty, Hanson sold the ranch to Trask for $3,099,755. Thereafter, Kjerstad Realty initiated a claim for breach of the exclusive listing agreement to recover the 5% commission, sales tax, and prejudgment interest. Kjerstad Realty filed a motion for summary judgment. The circuit court granted Kjerstad Realty's motion for summary judgment against Bootjack Ranch, awarding Kjerstad Realty $161,187 in commission and sales tax and $23,232 in prejudgment interest, plus $678 in costs. Bootjack Ranch appeals, raising the following issue:

> Whether a question of material fact exists to preclude a finding that Kjerstad Realty was entitled to a commission per the listing agreement.

## STANDARD OF REVIEW

[¶5.] This Court's standard of review for summary judgment actions is well-settled. "'We will affirm the trial court's grant or denial of a motion for summary judgment when no genuine issues of material fact exist, and the legal questions have been correctly decided.'" Arch v. Mid-Dakota Rural Water Sys., 2008 SD 122, ¶7, 759 NW2d 280, 282 (quoting A-G-E Corp. v. State, 2006 SD 66, ¶13, 719 NW2d 780, 785). When determining if a material fact exists, a court must view the facts in the light most favorable to the nonmoving party. Dakota Plains AG Ctr., LLC. v. Smithey, 2009 SD 78, ¶14, 772 NW2d 170, 178. We review questions of law, such as

the interpretation of a contract, de novo. *Arch*, 2008 SD 122, ¶7, 759 NW2d at 282 (citing *A-G-E Corp.*, 2006 SD 66, ¶15, 719 NW2d at 786).

## ANALYSIS

*Written Listing Agreement Supersedes Oral Negotiations*

[¶6.] Bootjack Ranch contends the 180-day tail provision does not apply to the sale to Trask because Kjerstad Realty did not substantially perform its obligation under the listing agreement. Although Bootjack Ranch also asserts Kjerstad Realty told Hanson prior to signing the agreement that she could terminate it at any time with no penalty, the circuit court correctly determined the written 180-day tail provision controlled. South Dakota law provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." SDCL 53-8-5. Bootjack Ranch argued the "parol agreement was the inducing and moving cause of the written contract 'and where the contract was executed upon the faith of the parol agreement, such evidence is admissible.'" *See* McCollam v. Littau, 307 NW2d 144, 145 (SD 1981) (quoting De Pue v. McIntosh, 26 SD 42, 127 NW 532 (1910)). However, as noted in *McCollam*, this rule should not be "'extended to cases in which the written contract is complete and unambiguous and the consideration contractual in its nature.'" *Id.* (quoting Farmers' Elevator Co. v. Swier, 50 SD 436, 443, 210 NW 671, 673 (1926)). Neither party argues the contract is ambiguous or an incomplete agreement. Because the alleged oral modification occurred before the

written agreement was made, the written agreement controls and defines the obligations of the parties.

*Terms of the Listing Agreement*

[¶7.]        One obligation in the listing agreement provides that the seller pay a commission to the broker "[i]f during the period of [the] agreement," the "Seller, Broker, a cooperating broker, or anyone else" sells the property or "produce[s] a purchaser ready, willing and able to purchase the property." The agreement also requires the seller to pay a commission "within 180 days after the contract [expires]" if the property is sold "to any person to whom the property has been shown during the listing period." The contract, in relevant part, provides:

> If during the period of this agreement the property is sold by Seller, Broker, a cooperating broker, or anyone else; or should any of the above produce a purchaser ready, willing and able to purchase the property; or within <u>180</u> days after the expiration of this contract, a sale is made to any person to whom the property has been shown during the listing period; Seller agrees to pay a fee for professional services of <u>-----</u> OR <u>5.00</u> percent of the selling price plus appropriate sales tax. Seller further agrees that Broker or Broker's authorized representative may act as escrow agent for all money, papers, and documents associated with this transaction. If this property is listed with another licensed real estate broker after expiration of this listing, this contract shall be null and void in its entirety.

[¶8.]        Hanson sold the property to Trask within 180 days after the contract expired. The parties disagree as to what constitutes a showing of the property under the agreement. Ensz admits he did not actually "show" the ranch to Trask, in the sense of viewing the property. Ensz claims, however, that Trask knew about the property because he rented part of the ranch and lived nearby. Consequently, Kjerstad Realty argues an actual escort to the property "to see" it was unnecessary

and Ensz's contact with Trask on January 20, 2007, satisfied its obligation under the agreement and entitled it to a commission.

[¶9.]     The listing agreement does not define "showing," and only one other provision in the listing agreement refers to "showing the property." This reference is in a portion of the agreement that discusses how the broker must act in the event the broker represents both buyer and seller. This provision does not clarify what the parties meant by the term "showing." It merely provides that "[b]roker will act, with Seller's consent . . . when showing Seller's property to buyer client(s) of broker."

[¶10.]     Bootjack, pointing to *Prudential Kahler Realtors v. Schmitendorf*, claims the meaning of the term "to show" is its "plain and ordinary meaning" of "to cause or allow to be seen; display." 2003 SD 148, ¶10, 673 NW2d 663, 666. In *Prudential Kahler Realtors*, the broker sought a commission after the seller sold property within the listing agreement's 360-day tail period. The listing agreement provided that if the property was sold within the listing agreement period, "or if within[] 360 days after the expiration of this agreement, the property is sold *to any person to whom the property was shown* the seller agrees to pay a commission of 9% of the sales price plus required sales taxes and applicable transaction fees[.]" *Id.* ¶2 n*, 673 NW2d at 664 n* (emphasis in original). As in the present case, the seller in *Prudential Kahler Realtors* argued the property was not "shown" to the buyer by the seller's realtor. *Id.* ¶9. That case was tried to the circuit court. Based on the facts, the circuit court determined that although the buyer "reviewed certain written

materials including the financials provided by [seller's] realtor," such a review was not a showing and did not entitle the broker to a commission. *Id.* ¶10.

[¶11.]    On review of the record, we determined in *Prudential Kahler Realtors* that the circuit court's finding was not clearly erroneous. In interpreting the term "showing" in the contract, we said "[i]n cases such as this one where the parties to a contract cannot agree on the interpretation of a word in the contract, this Court will apply the 'plain and ordinary meaning' of the disputed term." *Id.* We determined the plain and ordinary meaning of "shown" was "'to cause or allow to be seen; display.'" *Id.* (quoting American Heritage College Dictionary 1262 (3ded.1997)). Thus, whether there was a showing was a question of fact. It was undisputed the broker "never personally spoke with [buyer]." *I*d. ¶11.

*Substantial Performance of Listing Agreement*

[¶12.]    In *Kahler, Inc. v. Weiss*, we adopted the rationale of the North Dakota Supreme Court, that in order for a broker to collect a commission, "'[t]he broker must show substantial performance of the duties imposed on him by the contract, even if he does not produce a buyer to be eligible for a commission.'" 539 NW2d 86, 91 (SD 1995) (quoting Kruger v. Soreide, 246 NW2d 764, 773 (ND 1976)). Consideration for the exclusive listing agreement requires "[a] broker [to] perform with best efforts [in order] to collect a commission under an exclusive selling agreement." *Id.* at 91. Whether the broker performed with best efforts depends on the facts of the case. Those best efforts include evidence of "expenditure of time, effort, or money." *Kruger*, 246 NW2d at 773.

[¶13.] Here, the listing agreement between Bootjack Ranch and Kjerstad Realty specifically contemplated the broker would show the property as part of his "efforts." Even though Kjerstad Realty admitted Ensz did not technically "show" the property to Trask, it claimed it was unnecessary because Trask was familiar with the property. Thus, Kjerstad Realty claimed it was entitled to the commission because it substantially performed under the contract. Normally, substantial performance under a listing agreement is a question of fact. *Kahler, Inc.*, 539 NW2d at 90. Since Kjerstad Realty brought the matter to the circuit court as a summary judgment action, the facts must be viewed in the light most favorable to Bootjack Ranch.

[¶14.] It is undisputed the only contact between Kjerstad Realty and Trask took place at a social gathering at Hanson's residence, not at Bootjack Ranch. The social gathering was to celebrate Hanson's birthday. In her affidavit, Hanson said she wanted to invite Trask to her birthday party to meet Ensz and that Trask had an interest in the Bootjack Ranch. Trask arrived at the party with flowers and an ice cream cake for Hanson. Hanson claimed the conversations at the party between her, Trask, and Ensz regarding Bootjack ranch "were not specific as to price or other terms or conditions related to a purchase of the Bootjack Ranch." Both Hanson and Trask described Ensz as "antagonistic" toward Trask regarding the sale of Bootjack Ranch and that Ensz's comments were not productive and did not facilitate any negotiations. Ensz did not meet with or discuss the purchase of the ranch with Trask before this meeting nor did he communicate with Trask after the meeting. Trask relates in his affidavit that he "was never shown or physically taken to any

portion of the Bootjack Ranch property by anyone associated with Kjerstad Realty, so to have 'knowledge' or 'familiarity' of the entire property."

[¶15.]     In reviewing a grant of summary judgment, we must accept the non-moving party's version of the facts as true. Kjerstad Realty disputes Trask's statement by arguing Trask had intimate knowledge of the property because he leased part of the ranch, owned property that bordered the ranch, and was Hanson's friend. Although Kjerstad Realty's argument concludes that Trask had intimate knowledge of the property, the record does not establish what part of Bootjack Ranch Trask leased or how much knowledge Trask had of the 6,365 acres. Just because someone may be a neighbor, friend, or partial rentor does not automatically absolve a realtor of obligations under the listing agreement. We must accept as true that Kjerstad Realty's efforts did not provide Trask with "'knowledge' or 'familiarity' of the entire property" or that Ensz's "antagonistic nature on January 20th did not facilitate, in any way, negotiations or conversations for the sale of Bootjack Ranch."

[¶16.]     The main testimony as to Kjerstad Realty's efforts came from Ensz. Ensz indicated he knew Trask leased a portion of the ranch, but he did not know which portion Trask leased. Ensz also testified that Hanson, Trask, and Ensz discussed topics other than the purchase of the ranch at length and that he remained at Hanson's house for four to five hours. Ensz testified Trask was interested in purchasing the ranch on a contract for deed but the parties did not discuss a down payment, interest rate, amortization period, or any details of the purchase at the meeting. Ensz testified Hanson was reluctant to sell the ranch on a

-8-

contract for deed. Ensz admitted no one from Kjerstad Realty actually took Trask out and showed him the ranch. Ensz also testified Trask left him out of the conversation and that Trask directed his questions toward Hanson. Ensz indicated Trask was supposed to call him to put together a purchase agreement but the call never happened because Hanson removed the ranch from the market.

[¶17.] Whether the efforts of Kjerstad Realty constituted substantial performance involves disputed material facts. Kjerstad Realty admits it did not perform at least one of the requirements of the agreement – showing the property to Trask. Consequently, to prevail, Kjerstad Realty must show it substantially performed under the terms of the agreement for entitlement to its commission. Whether Kjerstad Realty has substantially performed under the agreement is a question for the fact finder. Thus, this is not a case for which summary judgment for Kjerstad Realty was warranted.

[¶18.] We reverse and remand for trial.

[¶19.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and SEVERSON, Justices, concur.