In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 13-2706

RICHARD ACOSTA and JENIFER ROMAN,

*Plaintiffs-Appellants,*

*v.*

TARGET CORPORATION, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 7068 — **Joan B. Gottschall**, *Judge.*

_____

ARGUED JANUARY 10, 2014 — DECIDED MARCH 19, 2014

_____

Before FLAUM and EASTERBROOK, *Circuit Judges*, and
GRIESBACH, *District Judge.*[*]

FLAUM, *Circuit Judge.* From 2000 to 2007, Target Corpora-
tion sent unsolicited general-purpose credit cards to millions
of existing holders of its limited-use charge cards accepted

_____

[*] Of the Eastern District of Wisconsin, sitting by designation.

only at Target. As part of this "upgrade" campaign, Target deactivated the holder's old card. Richard Acosta and Jenifer Roman brought a putative class action claiming that this campaign violated the federal Truth in Lending Act and state law. The district court granted summary judgment for Target and we affirm.

## I. Background

### A. The Autosub Program

Target Guest Cards are store credit cards, which permit guests to make purchases only at Target. Target began its Guest Card program in 1994 and has continued it ever since. In 2000, Target introduced Target Visa Cards, which are all-purpose credit cards that can be used anywhere, although they feature special benefits for Target customers. The Guest Card and the Visa were provided on different terms: Target used different underwriting criteria for each, they were governed by separate credit card agreements, and the Visa typically had a higher credit limit and lower APR than the Guest Card.

This controversy arises from Target's campaign to "upgrade" customer Guest Cards to Visas, which began in 2000 and lasted until 2007. From 2000 through mid-2006, Target called this program "Auto-Substitution," and from late 2006 through 2007 it was known as "Auto-Product Change." (For simplicity, we'll refer to the programs collectively as "Autosub.") During this time, Target sent unsolicited Visas to more than ten million current and former Guest Card hold-

ers. The cards were attached to a "card carrier"[1] and accompanied by a credit card agreement and marketing materials designed to entice the recipient to activate the new card.

When Target mailed the Autosubbed Visas, it typically deactivated the Guest Cards shortly afterward.[2] If a customer activated her new Target Visa, two things generally happened: the Visa's terms, set forth in the cardholder agreement, became effective, and the accountholder's Guest Card balance was transferred to the Visa. If the customer did not activate the Visa, Target closed her account entirely.

The materials sent with the Visas did not suggest that keeping the Guest Card was an option. Various fliers and brochures informed customers, "We've replaced your Target Card with a Target Visa" and "Your old Target Card will be closing soon, so cut up your old Target Card, activate your new Target Visa and start using it today!" Although the possibility was not highlighted for them, customers could in fact opt out of the Visa upgrade if they wished. A Guest Card accountholder could call Target to reject the Visa but ask to keep the Guest Card. Alternatively, if a holder attempted to use the Guest Card after the Visa had been mailed, she would be informed that the Guest Card account had been closed but that she had the choice to reopen it. Finally, Target telemarketers called over a million people who were

---

[1] Card carriers are tri-folded pieces of paper with a credit card attached. Their text prominently features some of the most attractive benefits of the credit card.

[2] In approximately 12,000 cases, Guest Card accounts remained open even after Visas were activated, but neither the record nor the parties explain how this happened.

mailed a Visa card but did not activate it immediately. During those calls, telemarketers advised customers that the Guest Card was about to expire, but they could keep it if they desired.

The credit limits on the Autosubbed Visas were always rounded to a number between $1,000 and $10,000, and the credit agreement gave Target the right to change the credit limit at its discretion. In contrast, new customers had to open a Target Visa through a standard application, and cards opened in this way could have credit limits as low as $500. Further, the method used for calculating the credit limit in the Autosub mailings was different than the method used after the Autosubbed Visa was activated. The Autosub materials did not indicate that the credit limits were subject to change, and customers often had their credit limits reduced after activation. For example, in the 2005 rollout, most customers initially had a credit limit of $1,000, but many with credit scores under 649 had their limits reduced.

Finally, both the Guest Card and Visa agreements gave Target substantial leeway to modify or cancel accounts. From 1994 through 2006, the Guest Card agreements provided:

> OUR RIGHTS—We may limit or cancel your Account. …
>
> OTHER CHANGES TO THIS AGREEMENT— We have the right to change this Agreement and apply those changes to the existing balance. We will make any changes in accordance with the law.

The Visa agreements in effect from 2000 through 2007 put it slightly differently:

> CHANGES TO THIS AGREEMENT. We have the right to change this Agreement (including the right to add additional terms) and to apply those changes to any existing balance.

**B. Proceedings below**

Richard Acosta applied for a Guest Card on June 1, 1999 and used it from 1999 until late 2005. Acosta received an unsolicited Visa in October of 2005. He activated the Visa the next month.

Jenifer Roman also obtained a Guest Card, although the date she opened the account is unclear. In September 2004, she received and activated an unsolicited Visa. Roman's Visa had a higher credit limit and lower minimum payment than the Guest Card, but because Roman carried a balance from the Guest Card and failed to pay on time, she ultimately incurred higher late fees and a worse interest rate than she would have had with a Guest Card.

Acosta and Roman claimed that the terms accompanying the Visas misleadingly implied that they described all of the differences between the Guest Card and the Visa. The headings in the brochure indicated that they were summaries of the differences between the two cards.

Plaintiffs sued Target individually and on behalf of a putative class. (Actually, they sued Target Corporation and two subsidiaries—Target Receivables LLC and Target National Bank—but except in one instance, discussed below, this makes no difference.) Their core claims were premised on two provisions of the Truth in Lending Act (TILA): 15 U.S.C.

§ 1642, which prohibits the mailing of unsolicited credit cards, and 15 U.S.C. § 1637(c), which requires credit card mailings to contain certain disclosures in a "tabular format."[3] Additionally, Plaintiffs brought state-law claims for fraud, breach of contract, tortious interference with business relations, and violation of an implied trust. Finally, Plaintiffs sought a declaration that Target violated TILA and the credit agreements.

The district court granted summary judgment on all claims. It found that the Autosub program did not violate § 1642 since it was a "substitution" of the Guest Card, which is specifically permitted by the statute. The court also found that Target had complied with § 1637(c). After deciding Plaintiffs' TILA claims, the court opted to exercise supplemental jurisdiction over the state-law claims. It concluded that Target did not defraud the Plaintiffs or other Visa recipients; that Target had not breached its credit card agreements; and that Target had not acted unjustifiably, thereby insulating itself from liability for tortious interference. The court dismissed the implied trust and declaratory judgment claims as derivative of the others.

Finally, the district court denied the Plaintiffs' motion for class certification. It noted that certain members of the putative class that Acosta and Roman sought to represent might well have a valid claim (specifically, recipients of Visas whose Guest Cards were not cancelled immediately and the

---

[3] In 2001 and 2002, the materials accompanying the Autosubbed Visas contained the table required by 15 U.S.C. § 1637(c). However, the Visas sent from 2004 to 2007 did not (the mailings for those years still contained the necessary information, but did not display it in tabular format). The record makes no mention of any mailings in 2003.

approximately 12,000 customers who simultaneously held valid Guest Cards and Visas). But neither Roman nor Acosta was among this subclass, and they had no valid claims themselves. Roman and Acosta were therefore inappropriate class representatives, so the court denied the motion for class certification.

## II. Discussion

Plaintiffs appeal most of the district court's rulings. We review the district court's grant of summary judgment de novo. *See Ellis v. DHL Express Inc.*, 633 F.3d 522, 525 (7th Cir. 2011).

### A. Section 1642

Section 1642 of TILA forbids credit card issuers from sending ready-to-use cards to consumers without receiving a request or application from the consumer. 15 U.S.C. § 1642. However, "[t]his prohibition does not apply to the issuance of a credit card in renewal of, or in substitution for, an accepted credit card." *Id.* We must therefore decide whether Target's Autosub program is a "substitution" within the meaning of the statute.

On its face, the Autosubbed Visa would appear to be a substitution, at least as the word is commonly understood. A substitute is "something that is put in place of something else or is available for use instead of something else." Webster's Third New International Dictionary 2280 (1993). The Target Visas qualify—they take the place of the Guest Card and assume all of the Guest Card's functions.

Nevertheless, the Supreme Court has instructed us to give special deference to regulations promulgated by the agency charged with the TILA's administration, the Federal

Reserve Board. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565–66 (1980); *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 366 (1973). The Board has promulgated its interpretation of the TILA in Regulation Z, but in this instance the regulation is not much help, for it simply tracks the language of § 1642. *See* 12 C.F.R. § 226.12(a) ("[N]o credit card shall be issued to any person except … [i]n response to an oral or written request or application for the card; or … [a]s a renewal of, or substitute for, an accepted credit card."). Fortunately, the Board also publishes an Official Staff Interpretation of Regulation Z. Like Regulation Z itself, this commentary is authoritative, and it controls our interpretation unless it is "demonstrably irrational." *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 931 n.5 (7th Cir. 1998).

The relevant portion of the Board's commentary elaborates on the term "substitution":

> 2. Substitution—examples. Substitution encompasses the replacement of one card with another because the underlying account relationship has changed in some way—such as when the card issuer has: …
>
>> iii. Changed the credit or other features available on the account. For example, the original card could be used to make purchases and obtain cash advances at teller windows. The substitute card might be usable, in addition, for obtaining cash advances through automated teller machines. … The substitution of one card with another on an unsolicited basis is not permissible, however, where

> in conjunction with the substitution an additional credit card is opened and the consumer is able to make new purchases or advances under both the original and the new account with the card. For example, if a retail card issuer replaces its credit card with a combined retailer/bank card, each of the creditors maintains a separate account, and both accounts can be accessed for new transactions by use of the new credit card, the card cannot be provided to a consumer without solicitation.

Official Staff Interpretation, 12 C.F.R. pt. 226, Supp. I, ¶ 12(a)(2)(iii).

This interpretation confirms that the Autosubbed Visa qualifies as a substitution. The Visa offers features different from the Guest Card—the ability to use the card anywhere, and credit limits and interest rates that differ from the Guest Card, just to name a few.[4] Moreover, while the commentary prohibits some substitutions spurred by new card features, those qualifications do not apply here. This is not a case where a new unsolicited card is issued, but then two accounts exist and both can be accessed when the customer activates the new card. When a Guest Card owner activated the Visa, the balance from the Guest Card was automatically

---

[4] We note, without deciding the question, that because the Visa was honored at a different merchant base than the Guest Card, it may potentially qualify as a substitution under ¶ v of the commentary, too. That section permits new card issuance when the merchant base changes. *See* 12 C.F.R. pt. 226, Supp. I, ¶ 12(a)(2)(v).

carried forward to the Visa and the Guest Card account was closed; if the consumer did not accept or activate the Visa, the Guest Card account was closed. Thus, as a result of the Autosub program, the cardholder's account relationship was changed in some way unless the cardholder took action to revert back to her former relationship with Target.

Plaintiffs try to cast the Visa mailings as an *offer* to change the underlying account relationship and not as an actual change to the account relationship. As support, they point to the instances where Guest Card holders were targeted for Visa substitution, but the customer either called Target or protested at the point of sale. But the Autosub program was more than a mere offer—unless a customer affirmatively resisted the substitution, either the Visa replaced the Guest Card or the Guest Card account was closed entirely.[5] Moreover, Plaintiffs' assertion that an offer to substitute the Visa for the Guest Card would somehow offend TILA is without support in the regulations or commentary. In fact, it strikes us as contrary to the spirit of TILA to read the statute as Plaintiffs urge. If a customer's ability to reject a substitution card somehow rendered the substitution illegal, issuers would instead impose the substitution with no opt-out ability. Consumer choice and flexibility would be hamstrung—a strange result under a consumer protection statute.

---

[5] Acosta and Roman also point to the small number of times where Target waited longer periods—120 to 150 days in some circumstances—to deactivate the Guest Cards, and the approximately 12,000 customers who somehow had active Guest Cards and Visas simultaneously. Both of these groups could have used the Guest Card account and the Visa account at the same time, and may therefore fall outside the Board's definition of an acceptable substitution. But Acosta and Roman are not among this group, and they cannot pursue the potentially valid claims of others.

The Visa was therefore a valid substitution for the Guest Card, both as the word is commonly understood and as the Board has interpreted the term for the purposes of TILA.

**B. Section 1637(c)**

Section 1637(c) is a disclosure statute, which means that it governs the content and form of disclosures for new credit accounts. The central question here is whether Target's issuance of the Visas opened a new account, or merely changed an existing one. In the former case, the issuer must make certain initial disclosures, which must be presented in tabular format in a so-called "Schumer Box."[6] 15 U.S.C. § 1637(c); 12 C.F.R. § 226.6(b)(1). In the latter, the issuer must also make certain disclosures, but need not place the information in a table. 12 C.F.R. § 226.9(c)(2). Target's mailings between 2004 and 2007 did not include a Schumer Box, but they complied with § 226.9(c)(2).

In the case of substitutions, the difference between new accounts and changes to existing accounts is fuzzy, and the statute is ambiguous. When the Autosub programs were implemented, Regulation Z and the Board commentary were silent on what constituted a new account and therefore required initial disclosures. However, in 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure (CARD) Act. Pub. L. No. 111-24, 123 Stat. 1734. The CARD Act amended § 1637 of TILA, and these changes were incorporated into the regulations. The Board also is-

---

[6] So named for Senator Charles Schumer, who was the chief proponent of requiring tabular formatting for initial disclosures when TILA was being shaped and debated. *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 263 n.1 (3d Cir. 2003).

sued a new commentary, "to clarify the application of the disclosure requirements … when one credit card account is substituted or replaced with another." Truth in Lending, 74 Fed. Reg. 54124-01 (proposed Oct. 21, 2009).

The new commentary incorporates a flexible approach for card issuers, and it prescribes a six-factor inquiry to decide if a substitution results in a new account requiring initial disclosures. 12 C.F.R. pt. 226, Supp. I, ¶ 5(b)(1)(i)(6). In the district court, Target conceded that the new commentary—if it applied—required it to treat the Autosubbed Visas as new accounts. But the district court concluded that the 2010 commentary was only applicable to post-CARD Act conduct, and Plaintiffs have not appealed this ruling, thus waiving any argument that the commentary should apply to their case.[7]

Of course, it is still possible that the Autosubbed Visas should have been treated as a new account under TILA and Regulation Z as they existed in 2004–2007. The district court never addressed this question, and we have located no case law or administrative materials on point.

Target points to a broad definition from Black's Law Dictionary, which defines "account" as a "detailed statement of the debits and credits between parties to a contract or to a

[7] Plaintiffs do argue that the 2004 amendments to Regulation Z and accompanying Board commentary should apply. But this commentary, by its terms, applies only to accounts that have been closed. 12 C.F.R. pt. 226, Supp. I, ¶ 5(b)(1)(i)(3). The Guest Card accounts of Roman, and presumably other members of the putative class, were inactive, but nothing indicates that they were actually closed. There is a difference between an account closed due to inactivity—which is contemplated in the commentary—and an account that remains open, but inactive.

fiduciary relationship; a reckoning of monetary dealings[; or a] course of business dealings or other relations for which records must be kept." Black's Law Dictionary 19 (9th ed. 2009). Target's reliance on this expansive definition—encompassing the total relationship between the parties—was reasonable and supports Target's theory that the Visas did not create a new account. Target had no way of knowing during the early- and mid-2000s that the Autosubbed Visas would violate § 1637, and so Target made the reasonable judgment that new account disclosures were not required. Even the new Board commentary contemplates some substitutions where new account disclosures are not required in a post-CARD Act world. We do not suggest that the current Board commentary is an impermissible construction of the statute, only that Target's interpretation was reasonable, too. We therefore decline to hold Target liable for a change it could not predict. *Cf. Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (before imposing financial liability on regulated parties, "agencies should provide … fair warning of the conduct a regulation prohibits or requires" (internal quotation marks and citation omitted)).

### C. State-law fraud

Plaintiffs next allege that they were fraudulently induced to accept the Visa. Both parties agree that the credit agreements and any dispute between Target and cardholders are governed by South Dakota law. South Dakota fraudulent inducement law is unexceptional, and requires:

> that a representation [1] was made as a statement of fact, [2] which was untrue and [3] known to be untrue by the party making it, or else recklessly made; that it [4] was made with

intent to deceive and for the purpose of induc-
ing the other party to act upon it; and that [5]
he did in fact rely on it and was induced there-
by to act to his injury or damage.

*N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'n Servs., Inc.*, 751
N.W.2d 710, 713 (S.D. 2008). Misrepresentations can also "in-
clude true statements which the maker knows or believes to
be materially misleading because of his failure to state addi-
tional qualifying matter. *Maybee v. Jacobs Motor Co., Inc.*, 519
N.W.2d 341, 343 (S.D. 1994) (citing Restatement (Second) of
Torts § 229 (1977)).

Plaintiffs' fraud allegations include two primary mis-
deeds: (1) that Target misled Guest Card holders into believ-
ing that their APRs and credit limits would not be adjusted,
when in fact they would be, and (2) that Target misled Guest
Card holders into believing that they were required to ex-
change their Guest Cards for Visas in order to maintain a
credit account with Target.

Plaintiffs claim that the advertised APR and credit limits
included with the credit card carrier were "bait and switch"
tactics, because many customers would eventually be subject
to a higher APR and credit limit. Target made no representa-
tions about the customer's ability to keep a specific credit
limit or a certain APR, but Plaintiffs argue that the materials
implicitly made these promises. Yet Target included sum-
maries of the differences between the Guest Card and Visa,
which laid out the different application of penalty APRs and
credit limit reduction risks.

We can dismiss the complaint of APR penalties straight-away—Target disclosed the reasons for a spike in the APR and did not raise the rate unless payments were missed.

The potential for credit limit adjustment is different. Recall that Target always started the Autosubbed Visas with a credit limit of at least $1,000, even if the customer would not have otherwise qualified for that limit. These Visas were then subject to different underwriting criteria that governed the credit limit going forward, which sometimes resulted in the lowering of the limits (possibly without customers missing any payments—the record is not clear). Target apparently tried to prevent Autosubbed Visas from having their credit limits adjusted for the first six months after conversion, but 0.01% of accountholders experienced a change in their credit limit within a month of activating their Visas. Even so, Target's representations were not fraudulent. The Visa agreement stated that Target was free to change credit limits "for any reason not prohibited by law, including, but not limited to, changes in your credit capacity, your pattern of payments to us, or your purchasing behavior." Target never promised that the rates or limits would stay in effect for any specific length of time. Plaintiffs have therefore not demonstrated that the information accompanying the Autosubbed Visas was inaccurate or intended to be inaccurate under South Dakota law.

Plaintiffs' final claim of fraud alleges that Target induced them to activate their Visa accounts because the Autosub mailings did not inform Guest Card holders that it was possible to maintain their Guest Card account if they took affirmative steps to do so. Instead, the mailings simply said that if a cardholder activated the Visa, their Guest Card

would be deactivated, and that if a cardholder did nothing their Guest Card account would be closed. But, as the district court noted, unless Visa recipients took affirmative steps to maintain their Guest Card account, it *would* close, which means that the disclosure was truthful.

South Dakota law does permit fraud claims to proceed where a party makes true statements but omits "qualifying matter." *Maybee*, 519 N.W.2d at 343. Nevertheless, Target's omitting the fact that cardholders could maintain their Guest Cards by taking additional steps was not fraudulent. As the district court noted, Plaintiffs' position might require Target to disclose any condition that could theoretically be negotiated with the card issuer. We see no compelling reason to deem Target's conduct fraudulent.

### D. Breach of contract

Plaintiffs also claim that Target breached its contract with them—the Guest Card agreement—by sending the Visa with its new agreement. While South Dakota law construes credit card agreements narrowly and against the creditor, *see Citibank (S.D.), N.A. v. Hauff*, 668 N.W.2d 528, 532 (S.D. 2003), standard contract interpretation principles still apply to credit card agreements. *Id.* at 532–33.

Plaintiffs argue that the provision in the Guest Card agreement that permitted Target to "limit or cancel" their accounts prevented Target from "upgrading" their accounts to a Visa, which added features, as opposed to merely "limit[ing]" them. But this argument ignores another provision in the contract, which permits Target to "change this Agreement and apply those changes to the existing balance." Plaintiffs argue that if this latter language permits Target to

expand features on the account, then the "limit or cancel" provision would have no effect, and that this construction should therefore be avoided. However, it is not clear why that would be the case; a more natural reading is that the provision makes clear Target's ability to cancel the account. The ability to "change the Agreement" might otherwise be read only to include changes that continue the account on different terms, and not the ability to cancel the account for any reason. Target may have just been making plain its ability to close the account entirely.

In the alternative, plaintiffs argue that Target's right to make changes to "*this* Agreement and apply those changes to the existing balance" means that Target could make any changes it chose to the Guest Card agreement, but that Target was not free to substitute the entirely new Visa agreement in its stead. But there was nothing in the agreement that limited the scope of changes that Target was free to make. And anytime Target made changes to a credit agreement, it had to send out the revisions to customers; when revisions were substantial, it often made sense to send an entirely new document (as opposed to just the revised portions). The Visa agreement made substantial changes to the existing contract, so Target sent out an entirely new document. Plaintiffs' position is without support, save general pronouncements about construing credit agreements narrowly. We find that Target did not breach the Guest Card agreements.

### E. Tortious interference and other claims

Plaintiffs also allege tortious interference with a business relationship against Target Corporation. We use the corporation label specifically here, because the Guest Cards and Vi-

sas were actually issued by Target's wholly owned subsidiary, Target National Bank. Plaintiffs allege that Target Corporation directed Target National Bank to convert the Guest Cards into Visas. They claim that by doing so, Target caused Plaintiffs and others to lose their Guest Cards unjustifiably, thus interfering with their relationship with Target National Bank.

Plaintiffs cannot make out this claim under South Dakota law. Tortious interference in South Dakota requires, among other things, an intentional and unjustified act of interference by the tortfeasor. *See St. Onge Livestock Co., Ltd. v. Curtis*, 650 N.W.2d 537, 541 (S.D. 2002). Target acted in accordance with its contracts and with applicable laws, which makes liability for tortious interference impossible here. *Dykstra v. Page Holding Co.*, 766 N.W.2d 491, 500 (S.D. 2009).

Plaintiffs' claims for an implied trust, declaratory relief, and class certification were derivative of their other claims. Because their other claims fail, these do as well.

### III. Conclusion

Target's Autosub program did not violate the Truth in Lending Act or state law. The district court's decision is AFFIRMED.